In the Interest of R— L— K— and C— A— K—.

Mildred LUNSFORD, Juvenile Officer of Butler County, Respondent,

v.

E— L— K—, Appellant.

No. 21440.

Missouri Court of Appeals, Southern District, Division One.

Nov. 12, 1997.

Rehearing Denied Dec. 8, 1997.

James E. Laramore, Duncan & Laramore, Poplar Bluff, for appellant.

Mary L. Dilks, Poplar Bluff, for respondent.

CROW, Judge.

In a comprehensive, thoughtful and meticulous judgment, the juvenile court[1] terminated the parental rights of the mother and father of R__ L__ K__ ("Daughter") and C__ A__ K__ ("Son"). The father, E__ L__ K__ ("Father") appeals; the mother does not. This opinion is confined to the law and evidence pertinent to Father's claim of error.

Daughter was born April 15, 1988; Son was born June 18, 1990.

Father was jailed April 9 or 10, 1991, on an involuntary manslaughter charge arising from a "head-on collision." He remained in jail until April 15, 1992, when, pursuant to an earlier plea of guilty, he was sentenced to fifteen years' imprisonment.[2] Upon sentencing, he was delivered to the Division of Adult Institutions. At time of trial,[3] he was an inmate at Ozark Correctional Center near Fordland. His presumptive parole date is April 10, 1999; his maximum release date is April 10, 2006.

On May 7, 1991, a month after Father was jailed, the juvenile court "assumed custody" of Daughter and Son. On July 17, 1991, the juvenile court found it had jurisdiction of Daughter and Son "because of neglect" (evidently pursuant to § 211.031.1(1)(a), RSMo Cum.Supp.1990) and placed them in the custody of the Division of Family Services ("DFS"). DFS placed the children in foster care. At time of trial, the children had been with the same foster family approximately five years.

Section 211.447, RSMo 1994—a lengthy statute—authorizes a juvenile court to terminate parental rights. The issues in this appeal require a recitation of the pertinent (and prolix) provisions of that statute. They are:

"2. The juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer ... if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:

(1) ...

(2) ...

(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) ...

(d). ...

3. When considering whether to terminate the parent-child relationship pursuant to subdivision ... (3) of subsection 2 of

---

1. Under § 211.021(3), RSMo 1994, the juvenile court is the juvenile division of the circuit court.

2. Father was sentenced as a persistent offender.

3. Trial occurred November 19, 1996.

this section, the court shall evaluate and make findings on the following factors, when appropriate and applicable to the case:

(1) The emotional ties to the birth parent;

(2) The extent to which the parent has maintained regular visitation or other contact with the child;

(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child;

(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

(7) . . . ."

The juvenile court, in conscientious compliance with the statute, made the following findings regarding termination of Father's parental rights.

As to subdivision (3) of subsection 2, the juvenile court found the children had been under the jurisdiction of the juvenile court since July 17, 1991—a period exceeding five years—and that the continuation of the parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home.[4]

As to paragraph (a) of subdivision (3) of subsection 2, the juvenile court found no social service plans were entered into by Father and DFS, and that no plans were proposed by DFS. The court further found the reason no such plan was proposed was because Father was imprisoned. Additional-

ly, the court found the statute does not require proposal of a social service plan where such a plan "would be impossible by either party of implementation."

As to paragraph (b) of subdivision (3) of subsection 2, the juvenile court found the juvenile officer and DFS had made reasonable efforts to aid Father on a continuing basis to adjust his circumstances to provide a proper home for the children, but those efforts had been unsuccessful because Father had been in prison throughout the pendency of the action.

The juvenile court also made findings on paragraphs (c) and (d) of subdivision (3) of subsection 2; however, those paragraphs of the statute and the court's findings regarding them are not set forth in this opinion because neither of those paragraphs nor the findings are germane to Father's hypothesis of error.

As to subdivision (1) of subsection 3, the juvenile court found neither of the children had any substantial emotional ties to Father.

As to subdivision (2) of subsection 3, the juvenile court found Father had maintained regular visitation and other contact with both children as much possible, given his incarceration.

As to subdivision (3) of subsection 3, the juvenile court found Father had made significant payments for the cost of care and maintenance of the children, to the extent of his financial ability.

As to subdivision (4) of subsection 3, the juvenile court found no additional services would be likely to bring about lasting parental adjustment of Father enabling a return of either child to Father within an ascertainable period of time.

As to subdivision (5) of subsection 3, the juvenile court found Father was intensely interested in, and had shown a full commitment to, both children.

As to subdivision (6) of subsection 3, the juvenile court found Father had been convicted of a felony and was currently imprisoned,

---

4. The juvenile court found the foster home was a stable home where the children flourished. However, the court further found the foster home was, by its nature, temporary, and that in order for it to be permanent it would be necessary for the rights of the parents to be terminated so the children could be assured of the permanency of an adoptive home.

and that such incarceration is of such nature that it is unlikely Father will be able to provide the children with a stable home for a number of years.

The juvenile court also made findings on subdivision (7) of subsection 3; however, that subdivision of the statute and the court's findings regarding it are not set forth in this opinion because neither that subdivision nor the findings are germane to Father's hypothesis of error.

Father's sole point relied on is:

"The [juvenile] court erred in terminating the parental rights of [Father] by finding that the juvenile officer and [DFS] have made reasonable efforts to aid [Father] on a continuing basis to adjust his circumstances or conduct to provide a proper home for the children, and that those efforts have not been successful, because the evidence is insufficient to make those findings in that no testimony was presented as to the juvenile officer's efforts to aid [Father]; the sole [DFS] witness testified that no services were offered by [DFS] to [Father]; and [Father] testified that he maintained regular contact with his children and made every effort to plan for the provision of a proper home for his children."

According to the argument following Father's point, the juvenile court based its decision to terminate Father's parental rights exclusively on paragraph (b) of subdivision (3) of subsection 2 of § 211.447 (quoted earlier). Citing *In Interest of D.A.H.*, 921 S.W.2d 618 (Mo.App. W.D.1996), Father maintains that when a juvenile court terminates parental rights pursuant to subdivision (3) of subsection 2 of § 211.447, such court "is required to consider and make findings as to all four specified conditions or acts of the parent as found in [paragraphs] (a) through (d), and there must be proof as to at least one of those [paragraphs] to terminate." Father's contention is supported by *In Interest of D.A.H.*, *id.* at 621–22[8].

In the instant case, says Father, there was no proof of paragraph (b) of subdivision (3) of subsection 2 in that the DFS social worker

assigned to work with Father and his family testified DFS provided no services to Father after his incarceration. In conceding no services were provided, the social worker explained, "I don't have the ability to provide services while he's in prison."

However, although neither the juvenile officer nor DFS provided services to aid Father "on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the [children]," [5] the social worker testified she did send Father a report of the "permanency planning meetings" DFS held every six months regarding the children. Additionally, at the request of the juvenile officer, and with approval of the social worker's supervisor, the social worker arranged for the children to visit Father at Ozark Correctional Center once each month beginning in August, 1996. Three such visits occurred prior to trial.

Those gestures, while humane, do not demonstrate that the juvenile officer or DFS endeavored to aid Father in the manner described in paragraph (b) of subdivision (3) of subsection 2 of § 211.447. The record confirms no effort of that kind was made because, according to the social worker, Father's incarceration prevented it.

Based on that circumstance, Father's theory of error, as we comprehend it, is: (1) the juvenile court relied solely on paragraph (b) of subdivision (3) of subsection 2 of § 211.447 in terminating Father's parental rights, and (2) there was a failure of proof of that segment of the statute. Consequently, concludes Father, "the underlying reason for termination of [my] parental rights seems to boil down exclusively to [my] incarceration and its length." Father emphasizes that incarceration in and of itself is not a ground for termination of parental rights. § 211.447.3(6); *In Interest of H. M.*, 770 S.W.2d 442, 444[1] (Mo.App. E.D.1989); *In Interest of Baby Girl W.*, 728 S.W.2d 545, 548[6] (Mo.App. W.D.1987).

■ We begin our assessment of Father's claim of error by recognizing he is correct in

---

**5.** The clause enclosed by quotation marks is from paragraph (b) of subdivision (3) of subsection 2 of § 211.447.

asserting that in order to terminate parental rights under subdivision (3) of subsection 2 of § 211.447, a juvenile court must consider and make findings on paragraphs (a) through (d) of subdivision (3). However, we find no clue in the statute as to *what* the juvenile court must find in regard to those factors in order to terminate.

Subdivision (3) of subsection 2 of § 211.447 applies in instances where a child has been under the jurisdiction of the juvenile court for a year and conditions persist which would adversely affect the best interests of the child if the child were returned to the parent. In such circumstances, the juvenile court may terminate parental rights if there is little likelihood that the adverse conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or if the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. The ground for termination discussed in this paragraph has been characterized as "failure to rectify." *In Interest of D—L—C—*, 834 S.W.2d 760, 764 (Mo.App. S.D.1992).

In deciding whether to exercise the power to terminate for failure to rectify, the juvenile court must consider and make findings on paragraphs (a) through (d) of subdivision (3) of subsection 2 of § 211.447. Paragraphs (a) and (b) of subdivision (3) pertain to the efforts of social service providers to guide and assist the parent in correcting or eliminating *the conditions which threaten the welfare of the child*. The apparent purpose of those two paragraphs is to ensure that all reasonable means to help the parents remedy the adverse conditions are utilized, and that courts will not terminate parental rights where such efforts have not been made.

Here, one condition that prevented Father from maintaining a proper home for the children at the time the juvenile court took jurisdiction of them was Father's incarceration. That condition persisted, unchanged, at time of trial.

It is obvious that no social service plan—the subject of paragraph (a) of subdivision (3) of subsection 2—was feasible so long as Father remained incarcerated. The juvenile court so found, observing that implementation of such a plan would be impossible.

It is likewise obvious that no efforts by the juvenile officer or DFS to aid Father in adjusting his circumstances to provide a proper home for the children—the subject of paragraph (b) of subdivision (3) of subsection 2—would free Father from incarceration. The juvenile court, perhaps referring to the reports furnished Father by the DFS worker and the children's visits arranged by her, found the juvenile officer and DFS had made reasonable efforts to aid Father. However, to state the obvious, nothing those officials could do would change the harsh fact of Father's incarceration or the prospect that his earliest release date was still two and a half years in the future at time of trial.

The record thus confirms the juvenile court considered and made findings on paragraphs (a) and (b) of subdivision (3) of subsection 2 and, as reported earlier, on the other mandatory provisions of § 211.447.

█ While a cursory glance might indicate Father's parental rights were terminated solely because of his incarceration—a result forbidden by § 211.447.3(6)—a closer examination reveals otherwise.

█ As recited earlier, the juvenile court, in considering subdivision (1) of subsection 3 of § 211.447, found neither of the children had any substantial emotional ties to Father. There was ample evidence to support that finding. Father does not argue otherwise.

Furthermore, an official of the Department of Mental Health testified that both children receive services from that agency. Daughter has been diagnosed as having a "developmental language disorder." Son has been diagnosed as having a "developmental disorder, not otherwise specified." Both children had to repeat kindergarten. Son has an IQ of 83. Medicaid pays for the children's therapy.

The absence of substantial emotional ties by the children to Father—Daughter was only three when Father was incarcerated; Son was not yet one—coupled with the children's handicaps, demonstrate there is scant likelihood that it will be in the children's best interests to return them to Father when he is ultimately released from confinement.

Even if he is freed on his presumptive parole date, the children will then have been in foster care eight years.

We recognize there may be instances where a child is old enough to have a strong emotional tie to a parent at the time the parent is placed in confinement, and that the bond will be strong enough to endure a period of incarceration. Here, however, the social worker testified that at the outset of the first visit (August, 1996), neither child knew Father. Asked whether the children manifested any fear of Father after visiting him three times, the worker answered, "They don't mention him at all."

The absence of an emotional tie by a child to a parent was a circumstance considered in *In Interest of C.K. G.*, 827 S.W.2d 760 (Mo. App. S.D.1992). There, the estrangement was because the child blamed the parent for the abuse the child suffered at the hands of those with whom the parent lived. *Id.* at 766. Although the parent complied with the treatment plans provided by DFS, the appellate court affirmed the termination of parental rights, observing that according to the evidence, there was no assurance that the relationship could be repaired to an extent that would enable the child to be returned to the parent. *Id.* As explained there, compliance with a treatment plan does not preclude termination of parental rights. *Id.*

Here, the juvenile court found, *inter alia*, that the continuation of the parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home (§ 211.447.2(3)); that no social service plans were proposed because Father was in prison (§ 211.447.2(3)(a)); that the juvenile officer and DFS had made reasonable efforts to aid Father (§ 211.447.2(3)(b)); that neither child had any substantial emotional ties to Father (§ 211.447.3(1)); that no additional services would be likely to bring about lasting parental adjustment of Father enabling a return of either child to him within an ascertainable period of time (§ 211.447.3(4)); that Father's incarceration made it unlikely he would be able to provide the children a stable home for a number of years (§ 211.447.3(6)).

We hold the findings in the preceding paragraph are sufficient to warrant termination of Father's parental rights under subdivision (3) of subsection 2 of § 211.447, and we further hold those findings demonstrate that the termination of Father's parental rights was not based solely on his incarceration.

 Section 211.447.2 authorizes a juvenile court to terminate parental rights if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the grounds for termination in that statute exist. *In Interest of M.E. W.*, 729 S.W.2d 194, 195[2] (Mo. banc 1987). The juvenile court found termination of Father's parental rights was in the best interests of the children, and terminated Father's rights under subdivision (3) of subsection 2 of that statute. We hold the judgment is supported by clear, cogent and convincing evidence.

Judgment affirmed.

GARRISON, P.J., and PREWITT, J., concur.