52 S.W.3d 625 (2001)
In the Interest of A.R., Plaintiff;
Juvenile Officer, Respondent,
v.
D.R. (Father), Appellant, and
S.R. (Mother), Defendant.
No. WD 59440.
Missouri Court of Appeals, Western District.
August 14, 2001.
*628 Thomas R. Davis, Overland Park, KS, for appellant.
Kristin E. Kandt, Kansas City, MO, for respondent.
Katherine J. Rodgers, Kansas City, MO, for plaintiff.
William D. Stilley, Raytown, MO, for defendant.
Before ROBERT G. ULRICH, Presiding Judge, PATRICIA BRECKENRIDGE and JOSEPH M. ELLIS, Judges.
ELLIS, Judge.
D.R. ("Father") appeals from the judgment entered in the Circuit Court of Jackson County terminating his parental rights to his natural daughter, A.R.
Father had a relationship with A.R.'s mother "(Mother)" in the late 1980s that ended prior to A.R.'s birth on July 3, 1990. Shortly thereafter, Father began dating another woman whom he eventually lived with and with whom he had two children. At some point, Father and this other woman became engaged.
In 1993, Mother informed Father of A.R.'s existence. Subsequently, Mother would occasionally drop A.R. off to stay with Father when she was having trouble with whomever she was seeing at the time. Mother would drop A.R. off with Father after beatings of Mother by her boyfriend or when Mother's boyfriend would throw Mother and A.R. out of the house late at night. When A.R. arrived at Father's house, A.R. would not have anything other than the clothes on her back, and she usually needed to take a bath and have her hair combed. The length of time Mother would leave A.R. with Father varied from two days to three months.
In 1997, Father and his fiance decided to move to Mississippi with their children to be closer to his fiance's family. Father obtained a house and a new job in Mississippi. After Father moved to Mississippi, he did not maintain contact with A.R. because Mother moved frequently without telling him and did not have a telephone.
On April 2, 1999, the Division of Family Services ("DFS") took custody of A.R. as a result of alleged abuse by Mother. Subsequently, Father's sister ran into Mother on the street and found out that A.R. was in the custody of DFS. After discovering this information, Father's sister called Father and let him know where A.R. was. At that point, Father contacted DFS to find out where A.R. was staying and to express his interest in obtaining custody of her. After obtaining a telephone number for A.R., Father began making regular telephone calls to her. Father had numerous discussions and exchanged letters with DFS during this period of time, and eventually, DFS encouraged Father to come to Family Court in Kansas City to attempt to obtain custody of A.R.
Father returned to Kansas City for a hearing on August 25, 1999. During that hearing, Mother indicated that she did not want Father to have custody and refused to acknowledge that he was A.R.'s father. *629 Father was told that he would have to obtain a paternity test and have a home study done before A.R. could be transferred to DFS in Mississippi to complete the custody process. A.R.'s therapist also scheduled weekly family therapy visits with Father. The purpose of those sessions was for DFS to get better acquainted with Father.
At this point, Father arranged to move in with his sister in Kansas City while he was attempting to obtain custody of A.R. He quit his job in Mississippi and obtained employment at a restaurant in Kansas City. Father attended two family therapy sessions in September and one in October. Father would occasionally call and cancel therapy sessions because of work.
Another hearing was conducted on October 20, 1999. At that time, a paternity test had been performed indicating that Father was indeed the father of A.R.
Subsequently, Father attended a family team support meeting on October 22, 1999. At that meeting, DFS recommended that Father attend further family therapy sessions and some individual sessions with A.R.'s therapist. DFS also indicated that it had not yet received a home study report from Mississippi. DFS estimated that the custody process would take another six months. At that point, DFS authorized unsupervised, overnight visitation with Father.
For Halloween, Father bought A.R. a costume and took her out trick-or-treating. Early in November, Father took part in a parent/teacher conference at A.R.'s school. Later in November, Father went to a father/daughter breakfast with A.R. at her school. Father had overnight visitation with A.R. over Thanksgiving, Christmas and New Year's at his sister's house.
Father had individual therapy sessions with A.R.'s therapist on January 19, February 21, and February 28, 2000. He also had family therapy sessions twice in February and once in March. During this time, if Father were required to cancel a therapy session for any reason, Ms. Kimball would deny him visitation with A.R. until the next session.
On March 16, 2000, Father contacted Ms. Kimball and told her that he needed to return to Mississippi to try to save his relationship with his fiancé. At that time, a family therapy session was scheduled for him to tell A.R. Father met with A.R. and Ms. Kimball on March 20, 2000. During that session, Father explained to A.R. and Ms. Kimball that he needed to return to Mississippi to save his relationship with his fiancé but that he was going to continue to try to get custody of A.R.
Two days later, on March 22, 2000, a hearing was conducted. A copy of the order and judgment from that hearing was mailed to Father, and Father was also notified that the next hearing was set for June 21, 2000. While in Mississippi, Father did not maintain contact with either A.R. or DFS.
After his efforts to save his relationship with his fiancé in Mississippi failed, Father returned to Kansas City at the end of May 2000. Father did not contact DFS, Kimball or A.R. to let them know he had returned.
On June 19, 2000, the Juvenile Officer filed a Petition for Termination of Parental Rights of Mother and Father under § 211.447.[1] The petition noted that A.R. *630 had been in the custody of the Division of Family Services since April 2, 1999. In relevant part, the petition then set forth the following allegations against Father:
The child has been abandoned in that for a period in excess of six months [Father], has without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so. Specifically, [Father], has failed to maintain contact with the child and the Division of Family Services. [Father] has failed to provide support, financial or otherwise, for the child since the child came into foster care.
* * *
[Father] although physically and financially able, repeatedly and continuously fail [sic] to provide the child with adequate food, clothing, shelter, education, and other care and control necessary for the child's physical, mental and emotional health and development. Specifically, [Father] has failed to provide support, financial or otherwise, the child [sic] since the child's placement. Further, [Father] has failed to maintain contact with the Division of Family Services or the child since the child's placement into foster care.
* * *
[A.R.] has been under the jurisdiction of the Family Court for more than one year. The conditions of are is [sic] likelihood that those conditions will be remedied at an early date so that the child can be returned to the parents in the near future.... [Father] has failed to successfully complete treatment, so that the child could be placed in his custody. [Father] left the Jackson Country [sic] Circuit Court, and then returned to Mississippi in March, 2000, and he has not maintained contact with the Division of Family Service or the child. Despite participation, the father failed to successfully complete services.
* * *
Termination is in the best interests of the child in that:
(1) The child has few, if any, emotional ties to the parents.
(2) The parents have not maintained regular visitation or other contact with the child.
(3) The parents have not provided for the cost of care and maintenance of the child when financially able to do so.
(4) Additional services would not be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time.
(5) The parents have demonstrated a disinterest in or lack of commitment to the child.
WHEREFORE, the Plaintiff prays that the Court order, adjudge and decree that the parental rights of ... [Father] in, to or over [A.R.] be terminated.
Father did not appear for the June 21, 2000 hearing. Rather, he mistakenly appeared at court two days later, on June 23, 2000. While at the juvenile courthouse, Father ran into A.R.'s guardian ad litem who informed him that the hearing had occurred two days before and that a petition for termination of his parental rights had been filed prior to that hearing. The guardian ad litem recommended that Father obtain counsel.[2] After speaking with *631 the guardian ad litem, Father went to request that an attorney be appointed to represent him.
On June 28, 2000, the Circuit Court entered an order appointing an attorney to represent Father. A copy of that notice was sent to Father; the attorney for the juvenile officer, Mary Kay O'Malley; the office of the guardian ad litem; and to Kelli Doege at the Division of Family Services.
Two days later, on June 30, 2000, the Circuit Court entered a no contact order, which provided, in pertinent part:
IT IS FURTHER ORDERED: the parents shall have no contact or visitation with the child until recommended otherwise by the parent's therapist, the child's therapist, if any, and the guardian ad litem. The Court specifically finds that at present such contact and visitation is contrary to the best interests of the child. In no event shall the parents have unsupervised contact or visitation until further order of the Court. In the event of conflict between therapeutic recommendations, the recommendation of the child's therapist shall prevail until further order of the Court.
IT IS FURTHER ORDERED: Division of Family Service shall vigorously pursue adoptive placement for the child.
DFS scheduled another planning meeting to discuss A.R.'s situation for July 28, 2000. The DFS caseworker did not send notice of that meeting to Father.
On October 17 and 18, 2000, the Family Court conducted a hearing on the Juvenile Officer's Petition for Termination of Parental Rights. Prior to the hearing, Father still had not had any contact with DFS, Kimball or A.R. since his departure for Mississippi in March 2000.
On November 3, 2000, the Circuit Court entered its judgment terminating Father's parental rights to A.R. In relevant part, the Circuit Court stated:
The child's putative father is [Father] whose date of birth is September 8, 1961.
Pursuant to Section 211.447.4(1) RSMo., the Court finds by clear, cogent and convincing evidence that [Father] abandoned the child in that for a period in excess of six months [Father] has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child although able to do so. Specifically, [Father] has failed to maintain contact with the child and the Division of Family Services. [Father] has failed to provide support, financial and otherwise, for the child since the child came into foster care.
Pursuant to Section 211.447.4(2), the Court finds by clear, cogent and convincing evidence that the child has been abused or neglected. With respect to subsection (a) through (d) of 211.447.4(2) the Court makes the following findings: a) [Mother] has a mental condition which is permanent, which has no reasonable likelihood to be reversed, and which renders her unable to knowingly provide the child the necessary care, custody and control. Specifically, [Mother] has been diagnosed with schizophrenia, intermittent explosive disorder, borderline intellectual functioning, and such conditions impact her ability to provide the needs of the child and to safely care for the child; b) no evidence was adduced to support a finding of a parental chemical addiction; c) no evidence was adduced to support a finding of recurrent acts of *632 abuse; d) [Father] has failed to provide for the child's physical, mental and emotional needs by not providing necessities, financial or otherwise, to support the child.
Pursuant to Section 211.447.4(3) the Court finds by clear, cogent and convincing evidence that the child has been under the jurisdiction of the Family Court for more than one year. The conditions of a potentially harmful nature continue to exist and there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parents in the near future. Further, the continuation of the parent-child relationship greatly diminishes this child's prospects for early integration into a stable and permanent home. Specifically, ... [Father] has failed to successfully complete treatment, so that the child could be placed in his custody. [Father] left Jackson County Circuit Court, and then returned to Mississippi in March 2000, and he has not maintained contact with the Division of Family Services or the child. Despite participation, the father failed to successfully complete services, and has made no effort to work towards reunification.
As to subsections (a) through (d) of 211.447.4(3), the Court makes the following findings: a) [Mother] has made little or no progress in complying with the terms of the social service plans entered into by [Mother] and the Division of Family Services; b) the efforts of the Division of Family Services to aid [Mother] and [Father] in adjusting their circumstances or conduct to provide a proper home for the child have failed; c) [Mother] has a mental condition which is permanent, which has no reasonable likelihood to be reversed, and which renders her unable to knowingly provide the child the necessary care, custody and control. Specifically, [Mother] has been diagnosed with schizophrenia, intermittent explosive disorder, borderline intellectual functioning, and such conditions impact her ability to provide the needs of the child and to safely care for the child; d) no evidence was adduced supporting a finding of parental chemical addiction.
The Court further finds by clear, cogent and convincing evidence the following factors as specified in Section 211.447.6 RSMo.:
1. The child has few, if any, emotional ties to the parents.
2. The parents have not maintained regular visitation or other contact with the child.
3. The parents have not provided financial or other support for the cost of care and maintenance of the child since the child was placed in the custody of the Division of Family Services. The items the father did give were merely token gifts.
4. Additional services would not be likely to bring about lasting parental adjustment enabling a return of the child to the parents within an ascertainable period of time.
5. The parents have demonstrated by their abandonment of the child and their failure to maintain contact with the Division of Family Services and the child, and the mother's failure to appear in these proceedings, their disinterest and lack of commitment to the child.
The Court further finds by clear, cogent and convincing evidence that it is in the best interest of the child, [A.R.], that all parental rights of [Mother] and [Father] in, to and over the child, [A.R.], be terminated. The child is in need of and deserves a stable and permanent home.

*633 WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that all parental right of [Mother] and [Father] in, to and over [A.R.] are terminated ...
Father brings five points on appeal challenging the termination of his parental rights.
"In a court tried case where parental rights have been terminated, the trial court's decree will be sustained if it is in the best interest of the child and if the termination is supported by clear, cogent and convincing evidence." In the Interest of G.M.T., 965 S.W.2d 200, 202 (Mo.App. E.D.1998). "The facts and reasonable inferences therefrom are reviewed in the light most favorable to the trial court's judgment with due regard given to the trial court's determination of witness credibility." Id.
"The termination of parental rights is one of the most serious acts that a court can undertake." C.B.L. v. K.E.L., 937 S.W.2d 734, 737 (Mo.App. E.D.1996). "The juvenile officer, as petitioner, bears the burden of proof." In the Interest of M.H., 859 S.W.2d 888, 896 (Mo.App. S.D.1993). "This burden of proof is met if substantial evidence (evidence which, if true, has probative force upon the issues) is clear, cogent and convincing on the issues." Id. "Clear, cogent and convincing evidence is that which instantly tilts the scales in the affirmative when weighed against opposing evidence." C.B.L., 937 S.W.2d at 737.
In his first point, Father claims the trial court erred in finding that he had abandoned A.R. pursuant to § 211.447.4(1). Father claims that the trial court's finding was not supported by the evidence.
Under § 211.447.4(1), the juvenile officer is given the authority to file a petition to terminate the parental rights of a child's parent when it appears that the child has been abandoned. "A child over one year old at the time of the filing of the petition is deemed abandoned if, for a period of six months or longer, `[t]he parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so.'" In re C.M.D., 18 S.W.3d 556, 561 (Mo.App. W.D.2000) (quoting § 211.447.4(1)(b)) (emphasis added). Accordingly, in order to terminate parental rights for abandonment under § 211.447.4(1)(b), "[i]t must be proven that the parent, without good cause, left the child: (1) without any provision for parental support; and, (2) without making any arrangements to visit or communicate with the child, although able to do so." In the Interest of G.M.T., 965 S.W.2d at 202.[3]
"Furthermore, `[a]bandonment is defined as the voluntary and intentional relinquishment of custody of a child with the intention that the severance be of a permanent nature or as the intentional withholding by a parent of his care, love, protection and presence without just cause or excuse.'" In re C.M.D., 18 S.W.3d at 561 (quoting In re R.K., 982 S.W.2d 803, 806 (Mo.App. W.D.1998)). "Abandonment has been defined as a willful, positive act such as deserting the child; a willful delivery of the child with intention that the severance be permanent; a voluntary and intentional relinquishment of the custody of the child to another with the intent to never again claim the rights of a parent or perform the duties of a parent." In re *634 Adoption of H.M.C., 11 S.W.3d 81, 87 (Mo.App. W.D.2000). "Abandonment can also occur if a parent intentionally withholds from the child without just cause or excuse the care, love, protection and presence of a parent." Id. A finding of abandonment is usually not consistent with a case in which the child has been involuntarily taken and placed into foster care. Z.H. v. G.H., 5 S.W.3d 567, 571 (Mo.App. W.D.1999).
"When determining whether abandonment has occurred, the parent's intent, an inferred fact, is determined by considering all the evidence of the parent's conduct, both before and after the statutory period." In re Adoption of H.M.C., 11 S.W.3d at 87. "Proof of intent must be shown by clear, cogent and convincing evidence." Id.
The specific allegations regarding abandonment contained in Respondent's petition for termination of parental rights alleged that Father had, at the time the petition was filed, abandoned A.R. for a period of over six months since she had been placed in foster care. On appeal, Respondent argues, without elaboration, that any contact Father had with A.R. while she was in foster care was merely "token contact."
"[A] parent is not allowed to maintain only a superficial or tenuous relationship with his child in order to avoid a determination of abandonment." In re C.M.D., 18 S.W.3d at 562. "Pursuant to § 211.447.7, a trial court may attach little or no weight to infrequent visitations, communications or contributions." Id. "`In fact, courts may regard such efforts as token and terminate parental rights despite their existence.'" Id. (quoting In re R.K., 982 S.W.2d at 806).
Father asserts that the evidence presented by the juvenile officer at the hearing establishes that he maintained frequent contact with A.R. until his return to Mississippi in March 2000 and that, at the time the petition was filed, he had only been out of contact with A.R. for three months.
The uncontroverted evidence indicated that, after he discovered that she had been taken into the custody of DFS, Father contacted DFS to track down A.R. and to express his interest in obtaining custody. Father initiated telephone contact with A.R. from Mississippi after he was given that telephone number by DFS. In August 1999, Father came to Kansas City to attempt to gain custody of A.R. After the August 1999 hearing, Father quit his job in Mississippi, obtained employment in Kansas City and temporarily moved in with his sister. Father had a paternity test conducted to establish that he was A.R.'s father.
In the seven-month period from August 25, 1999, through March 20, 2000, Father attended six family therapy sessions and three individual therapy sessions. He attended the two family court hearings and the family team support meeting. Father took A.R. trick-or-treating for Halloween. In November 1999, Father took part in a parent/teacher conference at A.R.'s school and also went to a father/daughter breakfast with A.R. Father had overnight visitation with A.R. over Thanksgiving, Christmas and New Year's at his sister's house. Furthermore, Ms. Kimball testified that from August 1999 through March 2000 Father had "significant amounts of contact" with her related to A.R. No evidence was presented at trial indicating how much telephone contact Father had with A.R. between August 1999 and March 2000. In addition, Ms. Kimball testified that she had denied further requests for visitation by Father whenever he cancelled a therapy session.
*635 The record simply does not support a conclusion that Father's efforts to stay in contact with A.R. from the time she entered foster care until he returned to Mississippi in March 2000 were nominal or token. See, Z.H., 5 S.W.3d at 570-71 (reversing trial court's finding of abandonment where evidence showed that Father spoke with son over the phone at least once a month, left additional messages on the answering machine and provided occasional gifts and checks without regular support). Father's contact with A.R. while she was in foster care appears to have been substantially greater than those cases in which contact has been deemed nominal or token. See, H.D. v. E.D., 629 S.W.2d 655, 657 (Mo.App. E.D.1982) (holding parent's contacts were "token efforts" and would not preclude a finding of abandonment where contact was limited to one postcard, support of $25, and 4 to 10 telephone calls during a 12 to 18 month period); In the Interest of Y.M.H., 817 S.W.2d 279, 283 (Mo.App. W.D.1991) (holding minimal contacts did not preclude finding of abandonment where the parent's sole contact with the child had been limited to a 10-hour visit and financial support of $33); R.L.P. v. R.M.W., 775 S.W.2d 167, 170 (Mo.App. E.D.1989) (two visits over six-month period, where evidence indicated that the parent could have visited more, were token efforts); In the Interest of B.C.H., 718 S.W.2d 158, 161-62 (Mo.App. W.D.1986) (affirming termination of parental rights despite the fact the child was taken from the parent's custody involuntarily by court order, where the parent neither sought visitation nor attempted to communicate with the child for a period of over one year and resisted all efforts to arrange contact with the child).
Moreover, the record does not contain clear, cogent and convincing evidence that Father showed an intent to abandon A.R. for a period of more than six months between the time A.R. was placed in foster care and the time the petition was filed. Father temporarily relocated to Kansas City for seven months in an attempt to obtain custody of A.R. Father maintained more than token contact with A.R. during that time period. Father requested further visitation with A.R. that was denied. Father purchased clothing, food and gifts for A.R. Prior to returning to Mississippi, Father explained to both A.R. and her therapist that he would continue to attempt to gain custody of her.[4] Upon learning that a motion had been filed to terminate his parental rights, Father obtained an attorney to oppose that motion. This evidence simply does not support the conclusion that Father intentionally withheld "`his care, love, protection and presence [from A.R.] without just cause or excuse'" or show an intent by Father to abandon A.R. In re C.M.D., 18 S.W.3d at 561 (quoting In re R.K., 982 S.W.2d at 806).
Apparently recognizing that the evidence did not support the specific allegations of abandonment in the petition, Respondent focuses on the time period before the placement of A.R. into foster care and the time period subsequent to the filing of the petition. The Respondent argues *636 that Father's continued failure to contact A.R. after the no-contact order was entered by the court should be sufficient to support the trial court's order. In the alternative, Respondent contends that Father should be deemed to have abandoned A.R. based upon his conduct when Mother still had custody of A.R. and the fact that he never tried to take custody away from Mother.[5]
We initially note that the trial court's finding specifically related to the period of time "since the child came into foster care." Accordingly, Respondent's attempts to rely upon the period of time prior to A.R.'s placement in foster care to support this finding are misplaced.
Furthermore, even if Father's behavior prior to A.R.'s placement in foster care were sufficient to support a finding of abandonment at that time, the law allows a parent to repent his or her abandonment of the child. In re C.M.D., 18 S.W.3d at 563. Abandonment can be repented by the "actual or attempted exercise of parental rights and duties following the abandonment." In re J.W., 11 S.W.3d 699, 705 (Mo.App. W.D.1999). "A parent may repent an abandonment by at least making a reasonable effort to assume parental responsibility and to perform parental duties, in which case the abandonment is no longer a ground for termination of parental rights." J.H.H. v. J.D., 662 S.W.2d 893, 896 (Mo.App. E.D.1983). "[W]hether there has been a repentance requires an examination of the parent's intent, an inferred fact, determined by considering all the evidence of the parent's conduct." In the Interest of M.L.K., 804 S.W.2d 398, 403 (Mo.App. W.D.1991).
Father's actions in this case, as set forth supra, display a clear intent to repent any abandonment of A.R. After discovering that A.R. was in DFS custody, Father contacted DFS and expressed his interest in obtaining custody of her. He quit his job in Mississippi and temporarily relocated to Kansas City in an effort to obtain custody. He participated in therapy sessions and visitation with A.R. over the next seven months, seeing her at least twelve times. He bought her food, clothing and gifts. He attended individual therapy sessions, court hearings, and the only family team support meeting for which he was provided notice. All of these activities occurred prior to the filing of the petition to terminate his parental rights. These efforts by Father constitute a reasonable effort on his part to assume parental responsibility for A.R. and establish his intent to repent any prior abandonment. Therefore, any abandonment by Father prior to contacting DFS in 1999 was effectively repented, and evidence related to his conduct prior to that time cannot be deemed to support the trial court's finding of abandonment.
Similarly, Father's conduct after the filing of the petition to terminate his parental rights cannot form the basis for the *637 court's finding of abandonment. Section 211.447.4(1) only grants Respondent authority to file for termination of a parent's parental rights of a child over the age of one after the parent has abandoned the child for a period of six months or more. If Respondent cannot establish that the parent abandoned the child for six months prior to filing the petition, then Respondent had no statutory authority to bring the action in the first place. Thus, Respondent must show that Father abandoned A.R. for a period of six months prior to the filing of the petition, and Father's conduct after the filing of the petition and the entry of the no-contact order cannot be properly considered in determining whether the six-month period was satisfied.
We also note that the trial court's no-contact order precluded Father from having contact with A.R. without the approval of DFS. "To prove abandonment, there must be evidence which shows accessibility of the child for the purposes of visitation and communication." In the Interest of G.M.T., 965 S.W.2d at 203. Father testified that he thought that under the court order he could not have any contact with A.R. While the juvenile officer argues that Father should have scheduled a hearing and had the no-contact order amended or vacated, we find no indication in the record that Father knew that course of action was available.
Respondent simply did not meet its burden of submitting clear, cogent and convincing evidence that Father intended to abandon A.R. by failing to contact or visit her for the requisite six-month statutory period. Accordingly, the trial court's finding that Father abandoned A.R. was not supported by the evidence and must be reversed.
"Because the existence of one of the statutory grounds is a sufficient condition for termination of parental rights, provided termination is in the best interest of the child," we must also consider Father's claims that the trial court's findings under § 211.447.4(2) and (3) were not supported by the evidence.[6]In re *638 C.M.D., 18 S.W.3d at 564. Section 211.447.4(2) allows for termination of parental rights where the child has been abused or neglected. Section 211.447.4(2) requires that:
In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;
(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or
(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development.
While the findings made under one element of § 211.447.4(2) may be sufficient to establish neglect and support the termination of parental rights under that section, In the Interest of S.C., 914 S.W.2d 408, 413 (Mo.App. W.D.1996), such findings and the evidence supporting them may also be insufficient to establish neglect on the part of the parent sufficient to warrant termination of parental rights. They are simply elements that the trial court must consider in determining whether a parent has sufficiently neglected a child to warrant the termination of that parent's parental rights. § 211.447.4(2).
With regard to Father, the only finding rendered by the court under § 211.447.4(2) was that Father "has failed to provide for the child's physical, mental and emotional needs by not providing necessities, financial or otherwise, to support the child." In rendering related findings under § 211.447.6, the court further stated, "The parents have not provided financial or other support for the cost of care and maintenance of the child since the child was placed in the custody of the Division of Family Services." The court also specifically found that any items that Father gave to A.R. were "merely token gifts." *639 These were the only findings rendered by the court related to the claims of neglect against Father.
Father argues that these findings by the trial court were not supported by clear, cogent and convincing evidence and that the evidence does not support a finding of neglect. We agree.
The only evidence presented by Respondent tending to show a lack of financial support of A.R. by Father was minimal, at best. On cross-examination, Respondent adduced testimony from Father that while he was in Mississippi from 1997 through August 1999 he had not sent A.R. any cards or birthday presents. In Respondent's case in chief, Ms. Kimball testified that, while Father was in Kansas City from August 1999 through March 2000, she was aware that Father had provided A.R. with gifts, food and clothing. Respondent also adduced testimony from Father that he had given gifts of toys and clothing to A.R. between August 1999 and March 2000. Ms. Kimball and Ms. Doege both testified that they were not aware of Father sending any gifts, money or cards to A.R. after he returned to Mississippi in March 2000. On cross-examination, Father admitted only that he had not sent any gifts or support to his daughter from the time he returned to Kansas City in May 2000 up until the time of trial in October 2000.[7]
This evidence simply does not support the trial court's finding that Father had "not provided financial or other support for the cost of care and maintenance of the child since the child was placed in the custody of the Division of Family Services." Respondent's own evidence reflected that Father provided A.R. with an unspecified amount of food, clothing and gifts while she was in the custody of DFS. Furthermore, the record does not contain evidence establishing that Father failed to pay child support prior to returning to Kansas City in May 2000, less than one month before the petition for termination of parental rights was filed.[8]
Similarly, the trial court's finding that any items provided by Father to A.R. were merely "token gifts" is not supported by the evidence. The undisputed evidence reflects that Father provided A.R. with food, clothing and gifts. None of that testimony was either quantified or qualified. Without further testimony about these items, the trial court could not reasonably ascertain either the amount or the value of any of the contributions made by Father and most certainly could not have found by clear, cogent and convincing evidence that the items provided by Father were merely "token gifts."
In addition, the Children's Service Case Plan entered into by Father and DFS after the October 22, 1999 family team support meeting, does not reference any deficiency on the part of Father in providing support for A.R. and specifically states in the Financial Planning Section of the plan that "[t]here is no financial support plan implemented at this time." By making this statement and failing to implement a financial support plan, the Case Plan clearly implies that Father was either *640 meeting his obligations or Father did not have the physical or economic ability to meet those obligations. These provisions could certainly lead Father to believe he was sufficiently meeting his responsibilities. Furthermore, prior to the termination decree, no finding or order was entered by the trial court related to Father's support of A.R. Accordingly, the record does not indicate that Respondent or the Court ever provided Father with any indication, prior to the filing of the petition to terminate his parental rights, that he needed to provide more support to A.R. While Father's obligation to provide support to his child is not dependent upon the state informing him of that obligation, In the Interest of S.C., 914 S.W.2d at 412, the fact that Father clearly provided some support to A.R. and that Respondent failed to inform him that his efforts were inadequate is a relevant consideration in determining the level of support that was provided by Father and whether his conduct rose to the level of neglecting A.R.[9] Such consideration seems especially appropriate in this case in light of the fact that DFS expressly declined to implement a financial support plan or indicate that Father's level of support was insufficient in the Case Plan.
The record in this case simply does not support a finding that Father repeatedly or continuously failed to provide A.R. with adequate food, clothing, shelter or education under § 211.447.4(2)(d). The record clearly reflects that Father provided A.R. with food, clothing and presents while she was in foster care, and Respondent failed to present any evidence qualifying or quantifying Father's contributions or establishing the amount of any child support arrearage. Accordingly, Respondent failed to meet its burden of proving by clear, cogent, and convincing evidence that Father neglected A.R. under § 211.447.4(2), and the trial court's finding that Father's parental rights should be terminated under that subsection must be reversed.[10]
We must next consider whether the trial court could have properly terminated Father's parental rights under § 211.447.4(3). That subsection allows the court to terminate parental rights where (1) the child has been under the jurisdiction of the juvenile court for over one year, (2) the conditions that led to the assumption of jurisdiction still persist or conditions of a potentially harmful nature continue to exist, and (3) there is little *641 likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. § 211.447.4(3). When terminating parental rights under that subsection, the statute requires that:
[T]he court shall consider and make findings on the following:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control.
§ 211.447.4(3); In the Interest of R.E.A., 971 S.W.2d 865, 866-67 (Mo.App. W.D.1998). "The apparent purpose of [Paragraphs (a) and (b) ] is to ensure that all reasonable means to help the parents remedy the adverse conditions are utilized, and that courts will not terminate parental rights where such efforts have not been made." In the Interest of R.L.K., 957 S.W.2d 778, 782 (Mo.App. S.D.1997).
Under this subsection, the trial court found that A.R. had been under the jurisdiction of the court for over one year. The court further found that "conditions of a potentially harmful nature continue to exist and there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parents in the near future." The court also found that the continuation of the parent-child relationship greatly diminished A.R.'s prospects for early integration into a stable and permanent home.
With regard to Father, the court found that Father "failed to successfully complete treatment, so that the child could be placed in his custody" and that Father had returned to Mississippi in March 2000 and failed to maintain contact with DFS or A.R. The court found that "[d]espite participation, the father failed to successfully complete services, and has made no effort to work towards reunification." With regard to the findings on the four requisite factors, the only finding related to Father indicated that "the efforts of the Division of Family Services to aid [Mother] and [Father] in adjusting their circumstances or conduct to provide a proper home for the child have failed."
We initially note that all of the trial court's findings regarding conditions of a potentially harmful nature related to Mother and her boyfriend.[11] None of the findings identify any condition of a potentially harmful nature related to Father *642 that continue to exist, and our review of the record does not disclose any such condition.
With respect to the trial court's finding that Father failed to complete "treatment," the record does not reflect that he was being treated for any specific problem. Ms. Doege testified that the only services provided by DFS to Father were the family and individual therapy sessions with Ms. Kimball, and the record does not contain any reference to Father being under any other "treatment." Accordingly, the trial court's finding must necessarily have been referring to those individual and family therapy sessions with Ms. Kimball.
Regarding the therapy sessions, Ms. Kimball testified that the reason for those sessions was for her to get to know Father better to determine whether he would be an appropriate placement for A.R. She stated that she was unaware of any alleged inappropriate behavior by Father and that nothing she observed in the interaction or relationship between Father and A.R. indicated that Father should not get custody of her. Ms. Kimball testified that A.R. was always happy to see Father and that he appeared happy to see her and seemed very interested in A.R. Ms. Kimball stated that they would hug, talk, and have pleasant meetings. Clearly, the fact that DFS and Ms. Kimball did not think they knew Father well enough to recommend custody was not a "condition of a potentially harmful nature," nor does it justify a finding that "there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parents in the near future."
Ms. Kimball testified that her problem with Father stemmed solely from the fact that he had cancelled some of the therapy sessions because of work and the fact that he had returned to Mississippi prior to completing those sessions. She testified that in her opinion Father's failure to show up for appointments and his return to Mississippi made A.R. a "little sad" and added to A.R.'s feelings that adults had let her down in life. Ms. Kimball testified that the reason she thought that Father's parental rights should be terminated was because she thought A.R. deserved a permanent place to call home. Ms. Kimball stated that she did not have any problem with Father having continued contact with A.R., but that she felt he had had his chance to obtain custody.
Similarly, Ms. Doege testified that the only reasons for DFS changing the plan from reunification with Father to termination were his "sporadic participation" in therapy and his return to Mississippi in March 2000. Ms. Doege testified that, had Father remained in Kansas City and improved his attendance at therapy sessions, her recommendation would have continued to be reunification. Ms. Doege testified that she thought A.R. had already had enough people leave her in life and that she did not want to risk having her go through that again. Ms. Doege testified that as far as she was concerned Father was no closer to obtaining custody of A.R. than he had been in August 1999.
While the record does not establish exactly how many therapy sessions Father cancelled while he was in Kansas City, it does reflect that they were cancelled because of his work. Additionally, the record discloses that Father attended at least three individual sessions and six family sessions. Moreover, Ms. Kimball testified that she had "a lot of contact" with Father between August 1999 and March 2000. Given that the purpose of the therapy sessions was for Ms. Kimball to get to know Father better, we find it incredulous that no progress was made in that regard. Accordingly, we are unable to discern any clear, cogent and convincing evidence in the record which would support the trial court's findings that Father "has made no *643 effort to work towards reunification" or that the efforts of DFS to aid Father in adjusting his circumstances or conduct to provide a proper home for A.R. have failed.
In sum, the evidence adduced by Respondent at trial, when weighed against the opposing evidence, does not "instantly tilt the scales" in favor of terminating Father's parental rights under § 211.447.4(3). The trial court's finding that conditions of a potentially harmful nature continue to exist with regard to Father and its finding that there is little likelihood that those conditions could be remedied so that A.R. could be placed with Father in the near future are not supported by clear, cogent and convincing evidence. Accordingly, the trial court's termination of Father's parental rights under § 211.447.4(3) must be reversed.
Having found that the reasons stated by the trial court for terminating Father's parental rights are not supported by clear, cogent and convincing evidence, we must reverse the trial court's termination of Father's parental rights. Reversal of the court's order of termination does not have any bearing on the issue of the custody of A.R. In re A.M.C., 983 S.W.2d 635, 640 (Mo.App. S.D.1999). Physical custody of A.R. should remain with DFS subject to any reasonable visitation rights by Father deemed appropriate by the trial court, and custody of A.R. should not be given to Father unless and until the juvenile court determines that the environment in which A.R. would be living creates no reasonably foreseeable risk of harm to her physical and emotional well-being. Id.
All concur.
NOTES
[1] All statutory references are to RSMo Cum.Supp.1999, "the version of the section dealing with termination of parental rights in effect when the juvenile officer filed his petition."

In the Interest of F.M., 979 S.W.2d 944, 947 n. 1 (Mo.App. S.D.1998) (citing P.A.W. v. A.M.W., 716 S.W.2d 284, 287 (Mo.App. E.D.1986)).
[2] From the time he returned to Missouri for the hearing on August 25, 1999, up to and including this time, Father had always appeared pro se and had not had the benefit of advice from, or representation by, counsel.
[3] In the Interest of G.M.T. involved a prior version of § 211.447(1)(b), however, the language of the statutes is identical.
[4] "`[W]here there is good cause, because of a temporary situation, a parent may leave a child in the custody of a third party without abandoning the child.'" In re C.M.D., 18 S.W.3d 556, 562 (Mo.App. W.D.2000) (quoting In Interest of M.J.A., 826 S.W.2d 890, 897 (Mo.App. S.D.1992)). The evidence reflects that Father returned to Mississippi to attempt to salvage his relationship with his fiancé' and his two other children. After those efforts failed, Father moved back to Kansas City two months later. While Father should have maintained contact with A.R. and DFS while he was in Mississippi, he appears to have had good cause for temporarily returning to Mississippi after a seven-month absence.
[5] "[D]ue process requires that `[t]he petition in a termination of parental rights case should contain allegations likely to inform those persons involved of the charges, to the end that objection may be prepared.'" In the Interest of H.R.R., 945 S.W.2d 85, 88 (Mo.App. W.D.1997) (quoting In the Interest of D.M.J., 683 S.W.2d 313, 314 (Mo.App. S.D.1984)). "For this reason, we have previously recognized that it is necessary to terminate on grounds asserted in the Petition." In the Interest of H.R.R., 945 S.W.2d at 88. Accordingly, Respondent should not be heard to contend that the trial court's judgment is based upon and supported by evidence of conduct not alleged in the petition. While evidence of Father's actions prior to the assumption of custody by DFS and after the filing of the petition to terminate parental rights was relevant to assessing his intent to abandon A.R., Respondent cannot establish the requisite six-month period through this evidence.
[6] With regard to the trial court's findings related to these two subsections, Father also claims that the trial court improperly failed to consider and make some of the findings required by statute. When terminating a parent's rights under either of these subsections, the trial court is required by the plain language of the statute to consider and make findings on all four of the factors set forth in that subsection. In re A.P., 988 S.W.2d 59, 60-61 (Mo.App. S.D.1999). Findings are required on all of the factors, even if they are irrelevant to the facts or allegations in the case. In re A.M.C., 983 S.W.2d 635, 638 (Mo.App. S.D.1999). "If a factor is not relevant to the case, the trial court must state why the particular factor is not relevant." In the Interest of R.E.A., 971 S.W.2d 865, 867 (Mo.App. W.D.1998); See also In the Interest H.R.R., 945 S.W.2d 85, 89 (Mo.App. W.D.1997).

While Respondent's brief challenges Father's claim that the trial court's findings were insufficient under §§ 211.447.4(2) and (3), Respondent filed a motion with this court specifically stating that "[t]he trial court's judgment entered on November 2, 2000 in the case at hand does not address subparagraphs (a) and (c) of Section 211.447.2(2)[sic], RSMo for the father, D.R.; or subparagraphs (a) and (c) of Section 211.447.2(3)[sic], RSMo, concerning the father, D.R." In its motion, Respondent further acknowledges that such findings are required under the applicable case law.
With regard to § 211.447.4(2), the trial court's findings might arguably be sufficient under §§ 211.447.4(2)(b) and (c), however, the trial court clearly did not make findings under § 211.447.4(2)(a) regarding Father's mental health. Even if there was no evidence that Father had a mental condition, "the trial court was obligated `to state that grounds for termination under that subsection did not exist.' " In the Interest of R.E.A., 971 S.W.2d at 866 (quoting In the Interest of H.R.R., 945 S.W.2d at 89).
With regard to the trial court's findings under § 211.447.4(3), the trial court only made findings related to Father on factors (b) and, arguably, (d). The trial court clearly failed to make any finding related to Father regarding whether a social service agreement was entered into by Father or the progress made by him in that regard, and the court once again failed to make a finding relating to Father's mental health. Accordingly, the court did not make sufficient findings under § 211.447.4(3)(a) and (c).
"`This court is not in a position to overlook the clear statutory mandate that "the court shall consider and make findings"`" on the various factors set forth in §§ 211.447.4(2) and (3). In the Interest of R.E.A., 971 S.W.2d at 866 (quoting In the Interest of J.M., 789 S.W.2d 818, 822 (Mo.App. W.D.1990)) (emphasis in original). The trial court's failure to make the appropriate findings would, in and of itself, mandate reversal and remand of this matter for further findings. But in light of our determination that insufficient evidence was presented to support termination under these subsections, the error is moot.
[7] Father also testified that he had given A.R. a Halloween costume and bought her dinner on Halloween.
[8] While Respondent claims that Father "testified that ... he never came forward with consistent child support while A.R. was in custody at DFS or in the custody of her mother, "Respondent fails to cite to any support for that statement in the record. Having reviewed the record for any evidence related to Father's payment or non-payment of child support, we are unable to locate any clear and convincing evidence that Father failed to pay child support prior to May 2000.
[9] See C.S. v. Smith, 483 S.W.2d 790, 794 (Mo.App. E.D.1972):

[W]e believe it incumbent on the agency or juvenile officer to clearly establish that the natural parents were fully aware of their rights to visit their children and of their obligation to furnish support and other incidentals which demonstrate their interest in the children. While a child is in a foster home, the duty of the parents to support the child seems to be especially difficult for the parents to understand. This is entirely natural. The parents know that the children are being cared for, and that they are not being physically neglected.
Based on this type of factual case, we believe that the agency or juvenile officer should inform the parents of their obligation to support their child who is in foster care and to inform them of what the parents must do to meet this obligation.... The parents should be fully advised that failure to exercise their parental responsibilities and maintain contact with the children may result in the termination of their parental rights.
[10] See C.B.L. v. K.E.L., 937 S.W.2d 734, 738 (Mo.App. E.D.1996) ("The trial court characterized Kim's gifts to her son as `tokens' but it is clear that she continuously provided clothing, toys, and allowances to him. While her involvement in his activities was limited, it did exist. The record does not support a finding that Kim neglected her son as the courts have defined that term for purposes of termination of parental rights.")
[11] The court made findings that Mother had failed to progress in services so that A.R. could be returned to her, that Mother had exhibited bizarre behavior by threatening to kill the children and attempting to poison her boyfriend, that Mother failed to take advantage of visitation with A.R., and that there was a long history of domestic violence between Mother and her boyfriend and they continued to reside together.