**In the Interest of C.M.D. and S.D.,**

**Juvenile Officer, Respondent,**

**v.**

**M.D. (Mother) and G.B. (Grandmother), Appellants, R.D. (Father), Defendant.**

**Nos. WD 56616, WD 56685.**

Missouri Court of Appeals, Western District.

May 30, 2000.

Laura Higgins Tyler, Kansas City, Guardian ad litem.

Mary K. O'Malley, Robert M. Schieber and Michael R. Fogal, Kansas City, for Respondent.

Steven J. Schleicher and Douglas L. Miller, Kansas City, for Appellant M.D.

William D. Piedimonte, Independence, for Appellant G.B.

Before: LAURA DENVIR STITH, P.J., and HOWARD and NEWTON, JJ.

VICTOR C. HOWARD, Judge

The natural mother, M.D., appeals from the trial court's termination of her parental rights. M.D. raises two points on appeal. First, she contends that the trial court erred by denying her petition for writ of habeas corpus. Second, she contends that there was insufficient evidence for the trial court to terminate her parental rights.

The maternal grandmother, G.B., appeals from the trial court's denial of her motion to intervene in the proceeding for termination of parental rights involving C.D., one of the children.

We affirm.

## Facts

This case involves the termination of the parental rights of the natural mother, M.D., in regard to two minor children, C.D., born April 3, 1992, and S.D., born May 9, 1995. Prior to being taken into Division of Family Services ("DFS") custody, C.D. had been left in the care of his maternal grandparents most of the time since he was five weeks old. S.D. had been left in others' care several times as an infant. The children were removed from M.D.'s custody on February 8, 1996.

On February 9, 1996, the juvenile officer filed petitions alleging that the children were without proper care, custody and control in that M.D. left the children in the care of others while she abused drugs, and she did not make adequate provisions for the children's care. On March 29, 1996, the juvenile officer filed amended petitions alleging that M.D. repeatedly left the children in the care of others without making adequate arrangements for their care, custody and support. The petition also alleged that M.D. offered to "sell" S.D. to his foster parents on at least three occasions. The petition further alleged that M.D. habitually abused drugs and in January 1996 she tested positive for three controlled substances, including cocaine. On October 8, 1996, the family court commissioner sustained the petitions and found the children in need of care and treatment. The family court judge adopted the findings of the commissioner.

C.D. has had two official placements and one unofficial placement since coming into DFS care. Until October 1997, C.D. was placed with M.D.'s mother. S.D. was placed with a foster family when he came into DFS care, and he has remained in that placement throughout the time he has been in DFS care.

The juvenile officer filed petitions for termination of M.D.'s and the father's parental rights with regard to C.D. and S.D. on December 16, 1997.

On October 9, 1998, G.B., the children's maternal grandmother, filed a motion to intervene in the proceeding for termination of parental rights in the case involving C.D. The court denied G.B.'s motion.

The termination hearing was held on October 9, 1998. On October 26, 1998, the trial court terminated M.D.'s and the father's parental rights on the grounds discussed under Point II. This appeal followed.

### Point I of M.D.'s Appeal

M.D.'s first point on appeal is that the trial court erred by denying her petition for writ of habeas corpus. M.D. argues that the trial court failed to exercise discretion by referring to a court "policy" of denying such writs. M.D. claims that the denial of her request to personally appear before the trial court at the termination hearing was a violation of her due process rights in that her appearance would not have been an undue burden or delay to the proceedings, and her right to appear in a proceeding to terminate her parental rights should be considered an essential right.

M.D. filed her petition for writ of habeas corpus on October 8, 1998. On October 9, 1998, the trial court denied her petition. The trial court stated that it was denying the petition for the following reasons: 1) it is the tradition of the court that such petitions are not granted because of the obvious risk to the community and the possibility of flight; 2) the petition was filed the day before trial; and 3) M.D.'s rights were not substantially impaired because the court had made arrangements for M.D. to participate in the hearing by phone, such that she would be allowed to participate "in an audio fashion throughout the course of the trial and also be allowed to present testimony and hear and understand what the proceedings are with respect to each of her children."

Section 491.230.2 [1] provides, in relevant part, as follows:

No person detained in a correctional facility of the department of corrections shall appear and attend or be caused to appear and attend any civil proceeding, regardless of whether he is a party, except when: (1) The offender is a respondent in a chapter 211 proceeding to terminate parental rights. In such cases the trial judge may only issue a writ of habeas corpus ad testificandum to an offender after the department of corrections has been notified and allowed fifteen days to file a written objection and be granted an opportunity to appear and make an oral presentation in opposition to the offender's appearance on the basis of security considerations and the best interests of the child or children.

In the present case, M.D. filed her petition for writ of habeas corpus the day before trial. Under § 491.230.2, the department of corrections must be notified and allowed fifteen days to object to the petitioner's appearance before such a writ may be granted. We also note that the order setting cause, copies of which were provided to both M.D. and her attorney, stated as follows:

PLEASE BE ADVISED THAT TO COMPLY WITH SECTION 491.230 RSMO. CONCERNING THE ISSUANCE OF A WRIT OF HABEAS CORPUS AD TESTIFICANDUM FOR A PARTY IN THE CUSTODY OF THE DEPARTMENT OF CORRECTIONS FIFTEEN DAYS NOTICE PRIOR TO THE PRESENTATION OF THE WRIT TO THE COURT MUST BE GIVEN TO MICHAEL FINKELSTEIN, GENERAL COUNSEL OF THE DEPARTMENT OF CORRECTIONS, 2729 PLAZA DRIVE, JEFFERSON CITY, MISSOURI 65101.

If we were to grant M.D.'s point, it would mean that any parent involved in a termination proceeding could file a petition for writ of habeas corpus the day before trial, and the trial would then have to be post-

---

**1.** All statutory references are to RSMo Cum. Supp.1997, unless otherwise indicated.

poned while the department of corrections was given an opportunity to object to the petitioner's appearance. We do not believe that this is what the legislature intended when it drafted § 491.230.2. Because M.D.'s petition for writ of habeas corpus was not timely, the trial court did not err in denying her petition. Point I is denied.

### Point II of M.D.'s Appeal

M.D.'s second point on appeal is that the trial court erred in terminating her parental rights because there was insufficient evidence for the court to do so, in that the State failed to prove that she had abandoned the children, the trial court failed to consider all of the evidence presented, and the trial court included in its judgment alleged facts contradictory to her undisputed evidence.

"We will affirm the trial court's order terminating a parent's rights unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *In re M.P.W.,* 983 S.W.2d 593, 596 (Mo. App. W.D.1999). We will reverse the judgment of the trial court terminating the parental rights of a party only when we firmly believe that the judgment is wrong. *In re R.K.,* 982 S.W.2d 803, 805 (Mo.App. W.D.1998). "We review the facts and all reasonable inferences therefrom in the light most favorable to the trial court's order." *In re M.P.W.,* 983 S.W.2d at 596. In addition, we defer to the trial court's determination of the credibility of the witnesses. *In Interest of B.A.,* 931 S.W.2d 926, 930 (Mo.App. W.D.1996).

A trial court may terminate parental rights where it finds that it is in the best interest of the child and where it appears by clear, cogent, and convincing evidence that one of the grounds for termination under § 211.447 exists. *In re M.P.W.,* 983 S.W.2d at 598. "Clear, cogent and convincing evidence in an action for termination of parental rights is evidence that instantly tilts the scales in favor of termination when weighed against the

evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In Interest of J.M.,* 815 S.W.2d 97, 101 (Mo.App. W.D.1991).

In its judgments, the trial court stated that pursuant to § 211.447.2(1), it found that M.D. abandoned the children in that for a period of six months she, without good cause, left the children without any provision for parental support and without making arrangements to visit or communicate with the children although able to do so. Specifically, the court found that M.D. had made only token contact with the children since September 24, 1996, and she had not provided support, financial or otherwise, for the care of the children during the same period of time.

The court further found that pursuant to § 211.447.2(3), the children had been under the jurisdiction of the family court for more than one year, conditions of a potentially harmful nature continued to exist, and there was little likelihood that those conditions would be remedied at an early date so that the children could be returned to the parents in the near future. The court found that the continuation of the parent-child relationship greatly diminished the children's prospects for early integration into a stable and permanent home. Specifically, the court found that M.D. had failed to participate in substance abuse therapy, failed to participate in parenting classes, failed to maintain contact with the children, and generally failed to work toward reunification. The court found that M.D. had made token efforts since the filing of the termination petition. The court found that as to subsections (a) through (d) of § 211.447.2(3), (a) M.D. had made little or no progress in complying with the terms of the social service plans entered into by her and DFS; (b) the efforts of DFS to aid M.D. in adjusting her circumstances or conduct to provide a proper home for the children had failed; (c) no evidence was adduced to support a finding of parental mental condition; and

(d) no evidence was adduced to support a finding of parental chemical condition.

The trial court also made the following findings as to the factors specified in § 211.447.3: 1) the children had few, if any, emotional ties to the parents; 2) the parents had not maintained regular visitation or other contact with the children; 3) the parents had not provided financial or other support for the cost of care and maintenance of the children since they were placed in the custody of DFS; 4) no additional services would be likely to bring about lasting parental adjustment enabling a return of the children to the parents within an ascertainable period of time; 5) the parents demonstrated by their abandonment of the children and their failure to maintain contact with DFS and the children, their disinterest and lack of commitment to the children; and 6) M.D.'s conviction for forgery, a felony offense, is of such a nature that the children would be deprived of a stable home for a period of years. The court also found that the juvenile officer's evidence was more credible than the parents' evidence.

 M.D. first contends that the trial court incorrectly cited several of the statutes in its judgment. She cites the rule that "the severance of the parent-child relationship by an act of the law is an exercise of awesome power and demands strict literal compliance with the statutory authority from which it is derived." M.D. contends that "strict literal compliance" should require that the judgment contain proper citations of law in termination of parental rights cases. Section 211.447 was amended effective July 1, 1998,[2] after the petitions for termination were filed and before the court entered its judgments. There is a presumption in Missouri that statutes are to operate prospectively and not retroactively unless the legislature specifically provides that the statute have

retroactive effect or the statute is procedural or remedial only and the substantive rights of the parties are not affected. *Pierce v. State, Dept. of Social Services,* 969 S.W.2d 814, 822 (Mo.App. W.D.1998). Neither of the exceptions apply in this case, and therefore the amended law applied prospectively. In any case, the relevant 1998 amendments primarily changed the section numbers of the applicable provisions. The amended provisions remain substantively similar to the previous provisions.

 Next, M.D. argues that she did not abandon her children, and therefore the trial court erred in terminating her rights under § 211.447.4(1).[3] Under § 211.447.4(1), a juvenile officer or DFS may file a petition to terminate the rights of a parent to a child if the child has been abandoned. A child over one year old at the time of the filing of the petition is deemed abandoned if, for a period of six months or longer, "[t]he parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so." Furthermore, "[a]bandonment is defined as the voluntary and intentional relinquishment of custody of a child with the intention that the severance be of a permanent nature or as the intentional withholding by a parent of his care, love, protection and presence without just cause or excuse." *In re R.K.,* 982 S.W.2d at 806. "Abandonment focuses on the parent's intent, taking into consideration all evidence of the parent's conduct before and after the applicable statutory period." *Z.H. v. G.H.,* 5 S.W.3d 567, 570 (Mo.App. W.D.1999).

Pam Anderson, the DFS social service worker assigned to the case from November 1996 to July 1998, testified at trial that the children came into DFS care in Febru-

---

**2.** The relevant amendments are as follows: Section 211.447.2(1) was amended as § 211.447.4(1); Section 211.447.2(3) was amended as § 211.447.4(3); and Section 211.447.3 was amended as § 211.447.6.

**3.** In order to avoid confusion, we will refer to the section numbers as they appear in the amended statutes.

ary 1996 because "they had been left in the care of others frequently" without adequate arrangements being made for their care. She also testified that M.D. "did not meet [the children's] medical needs and their physical needs, provide diapers, clothes, food or money for their care." She testified that to her knowledge and according to the case file, M.D. had made no progress since the children came into DFS care. She testified that M.D. did not provide any support, financial or otherwise, for the children. She testified that M.D. did not send any cards, letters or birthday presents to the children until after the petition for termination of parental rights was filed. She testified that M.D. knew how to contact the children's custodians in order to contact the children. She testified that M.D. complied with few, if any, of the requirements of the written service agreements she entered into with DFS. She testified that neither of the children know their mother, and that they call the people they are living with mom and dad and that they have bonded with their custodial families. She testified that there were no services that DFS could offer M.D. to bring about reunification with the children. She testified that she had written about three letters to M.D. telling her that she would like M.D. to contact her so that they could discuss what services could be provided to her, and M.D. never responded to the letters.

S.D.'s foster mother testified that M.D. had not had any contact with S.D. from October 1996 to December 1997, and that M.D. had never sent her any money for S.D.'s support. She testified that M.D. did send S.D. an Easter gift in 1996 and that M.D. did write to him the first time she was incarcerated.

M.D. admitted that she had not sent any money to the children's foster families in order to help support the children. She said that she sent money to her mother to forward to S.D. M.D.'s mother testified that M.D. had never provided her with any money to help support C.D., and that she had only sent money to him at Christmas 1996. Concerning C.D., M.D.'s mother

testified that "[n]ow, continually [M.D.] would come around and he would see her, but there was such a huge space in between that he was—he lost contact of who she was. And that was just kind of the way the situation was."

■ M.D. correctly states the rule that "[w]here there is good cause, because of a temporary situation, a parent may leave a child in the custody of a third party without abandoning the child." *In Interest of M.J.A.*, 826 S.W.2d 890, 897 (Mo.App. S.D. 1992). "However, this principle is limited to cases where, once the temporary placement is made, the parent continues to show parental interest and concern for the child." *Id.* This is not the case here.

■ The record indicates that M.D. was incarcerated from April 1996 to August 1996, from March 1997 to September 1997, and from November 1997 to the date of trial. However, incarceration does not discharge a parent's statutory obligation to provide her child with a continuing relationship through communication and visitation. *In re R.K.*, 982 S.W.2d at 806. Furthermore, a parent is not allowed to maintain only a superficial or tenuous relationship with her child in order to avoid a determination of abandonment. *Id.* Pursuant to § 211.447.7, a trial court may attach little or no weight to infrequent visitations, communications or contributions. *Id.* "In fact, courts may regard such efforts as token and terminate parental rights despite their existence." *Id.*

■ Furthermore, the substantially reduced wages received by incarcerated parents do not excuse their obligation to make monetary contributions toward support of their children. *In Interest of M.L.K.*, 804 S.W.2d 398, 402 (Mo.App. W.D.1991). While such a contribution from an incarcerated parent will not significantly assist in providing the parent's child with essentials, even a minimal contribution evinces the parent's intent to continue the parent-child relationship. *Id.* Evidence of this intent is lacking when the

parent fails to make any contribution, no matter how diminutive the amount. *Id.*

It is undisputed that M.D. has not seen the children or spoken to them on the phone since September 1996. In addition, the record indicates that from February 1996 to December 1997, M.D. provided no financial support for the children, and from September 1996 to December 1997, she did not send the children any cards, gifts or letters, other than Christmas money in 1996, despite having information on where to contact the children. We find that there was clear, cogent and convincing evidence that supported the trial court's finding that M.D. abandoned her children.

M.D. contends that even if the evidence supported the trial court's finding that she abandoned the children, the evidence showed that she repented the abandonment. "A parent may repent of an abandonment. However, not every gesture by a natural parent will terminate such abandonment." *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455 (Mo. banc 1984) (citations omitted). Whether or not there has been a repentance of abandonment requires an examination of the parent's intent, an inferred fact, determined by considering all the evidence of the parent's conduct, including that before and after the statutory period. *Id.*

Almost all the actions M.D. cites as evidence of her repentance of abandonment occurred after the filing of the petitions for termination of her parental rights.

A parent's conduct after the filing of the termination petition cannot constitute the sole consideration of the trial court's decision. All grounds for termination must to some extent look to past conduct because the past provides vital clues to present and future conduct. Otherwise, a parent may argue that he has reformed since the filing of the petition; reformation having occurred while the child was away.

*In Interest of T.T.*, 954 S.W.2d 429, 432 (Mo.App. W.D.1997) (citations omitted). Furthermore, M.D.'s contributions and communications prior to the filing of the petitions were so infrequent that they were properly given little or no weight by the trial court. The evidence does not support M.D.'s contention that she repented her abandonment of the children.

M.D. further argues that the trial court erred in finding, under § 211.447.6, that 1) she failed to maintain regular visitation or other contact with her children; 2) she had not provided financial or other support for the children since they were placed in the custody of DFS; 3) she had demonstrated her disinterest and lack of commitment by her abandonment and failure to maintain contact with her children; and 4) her conviction for forgery is of such a nature that the children would be deprived of a stable home for a period of years.

Section 211.447.6 provides as follows:

When considering whether to terminate the parent-child relationship pursuant to subsection 2 or 3 of this section or subdivision (1), (2), (3) or (4) of subsection 4 of this section, the court shall evaluate and make findings on the following factors, when appropriate and applicable to the case:

(1) The emotional ties to the birth parent;

(2) The extent to which the parent has maintained regular visitation or other contact with the child;

(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child;

(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be

deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.

\* \* \* \* \*

We initially note that M.D. does not dispute the trial court's findings that the children have few, if any, emotional ties to her, and that no additional services would be likely to bring about lasting parental adjustment enabling a return of the children to her within an ascertainable period of time.

As for the trial court's finding that M.D. failed to maintain regular visitation or other contact with her children, this finding has already been addressed in our discussion of the trial court's finding of abandonment. We will not discuss it further here, other than to state that the evidence supports the trial court's finding.

In regard to the trial court's finding that M.D. had not provided financial or other support for the children since they were placed in the custody of DFS, the record indicates that M.D. did not provide any financial support for the children until after the petitions for termination were filed. There is no indication that M.D. ever provided food, clothing, or other support for the children while they were in DFS custody.

Concerning the trial court's finding that M.D. had demonstrated her disinterest and lack of commitment by her abandonment and failure to maintain contact with her children, this finding has also been discussed previously in this opinion, and without rehashing our previous discussion, we simply reaffirm that the evidence supports the trial court's finding.

In regard to the trial court's finding that M.D.'s conviction for forgery is of such a nature that the children would be deprived of a stable home for a period of years, the record reflects that at the time of trial, M.D. was incarcerated as a result of her conviction of the class C felony of forgery. She was eligible for parole in June 1998, and she was scheduled to be released on October 23, 1999. The judgment terminating M.D.'s parental rights was entered on October 26, 1998. Even if M.D. was released on the scheduled date and the trial court erred in finding that M.D.'s incarceration would deprive the children of a stable home for a period of years, the error is harmless, as the other factors in § 211.447.6 overwhelmingly weigh in favor of termination of M.D.'s parental rights.

▆▆ M.D. also argues that the trial court erroneously terminated her parental rights under § 211.447.4(3). Because the existence of one of the statutory grounds is a sufficient condition for termination of parental rights, provided termination is in the best interest of the child, review of the trial court's findings on the ground of abandonment is all that is necessary in this case. *In re R.K.,* 982 S.W.2d at 806. Point II is denied.

### G.B.'s Appeal

G.B.'s sole point on appeal is that the trial court erred in denying her motion to intervene in the termination of parental rights proceeding concerning C.D. because § 211.177 provides a right to grandparents to intervene in any proceeding in which custody is an issue unless the trial court decides that intervention is against the best interest of the child. G.B. contends that there was no evidence that intervention was against the best interest of the child. G.B. did not have custody of the child at the time she sought to intervene.

Section 211.177.1 provides as follows:

A grandparent shall have a right to intervene in any proceeding initiated pursuant to the provisions of this chapter, in which the custody of a grandchild is in issue, unless the juvenile judge decides after considering a motion to intervene by the grandparent that such interven-

tion is against the best interest of the child.

A termination of parental rights proceeding under § 211.447 is separate and distinct from a proceeding to determine custody under § 211.031. In a termination proceeding, the factors a court must evaluate and make findings on are set forth in § 211.447.6.[4] None of those factors involve custody of the child.

 Clearly the focus of the court is on the parent-child relationship and whether severing that relationship is in the best interest of the child. Custody of the child is not "in issue." Although § 211.453 allows a court to summons any other person whose presence it deems necessary to the proceedings, § 211.177.1 creates no right of intervention in a termination case. G.B.'s point is denied.

The judgment of the trial court is affirmed.

LAURA DENVIR STITH, P.J., and NEWTON, J., concur.

**In the Interest of C.M.D., Plaintiff, Juvenile Officer, Respondent,**

v.

**G.B. (Grandmother), Appellant.**

**No. WD 56723.**

Missouri Court of Appeals, Western District.

May 30, 2000.

---

**4.** These factors are set forth in our discussion of Point II of M.D.'s appeal.