249 S.W.3d 265 (2008)
In the Interests of K.M. and J.M., Plaintiffs;
Juvenile Officer, Respondent;
Missouri Children's Division, Respondent,
v.
J.M. (Father), Appellant;
K.M. (Mother), Appellants.
No. WD 68315.
Missouri Court of Appeals, Western District.
April 8, 2008.
*267 Thomas J. Keedy, Unionville, for Appellant.
*268 Jason Kyle Lisk, St. Joseph, Jason Slade Spillman, Trenton, for Respondent.
HOLLIGER, Presiding Judge.
K.M. ("Mother") and J.M. ("Father") (collectively, "Parents") appeal a judgment terminating their parental rights to their minor children, K.M. and J.M., pursuant to section 211.447.[1] On appeal, Parents challenge the trial court's finding of abuse and neglect on the basis that such finding was not supported by clear, cogent, and convincing evidence. They also claim that the trial court erred in determining that termination of parental rights was in the children's best interest. Having reviewed the record on appeal, we conclude that the trial court erred in finding grounds for termination of parental rights under section 211.447.4(2)(a), (2)(d), and (3). The judgment is reversed and remanded.

Factual and Procedural Background
K.M. and J.M. were born on May 31, 2002, and June 7, 2003, respectively. In February 2005, Missouri Department of Social Services, Children's Division ("the Division"), received a call reporting garbage and a strong odor emanating from Parents' home. After determining that the home constituted a health and safety threat to the children, the Juvenile Officer sought an order for protective custody pursuant to section 211.031.1. The court found that emergency circumstances existed and that continuation of the children in the home was contrary to their welfare. The children were placed with their maternal grandparents ("Grandparents"), where they continue to reside. One month later, the court assumed jurisdiction of the children under section 211.031.1.
A service worker, Crystal Reeter ("Reeter"), was assigned to work with the family toward the goal of reunification. Reeter described the home at her first visit as cluttered with "clothing and trash, empty pop cans, dishes on any available surface whether it be the TV, coffee table, couch, beds." Additionally, Parents' failure to pay their bills sometimes led to their utilities being turned off. Reeter counseled Parents about maintaining a safe and clean home with working utilities.
Reeter employed the assistance of a parent aide who visited the family nearly every week beginning in March 2005. She assisted Parents with creating a chore schedule and budget, developing parenting skills, and securing employment. After only three months, the parent aide felt that she was not making progress and discontinued her services in June 2005. According to Reeter, Parents' home maintenance had been improving with assistance from the parent aide but declined when she left.
At the Division's request, Dr. Fred Nolen performed psychological evaluations of Parents in May 2005. After interviewing and testing them, he made no Axis I diagnosis since his testing revealed no diagnosable mental illness. His Axis II diagnosis indicated that Father had an antisocial personality disorder and Mother had depression, avoidant personality disorder, and dependent personality disorder. He explained that "antisocial personalities are known for poor impulse control and poor judgment." He stated that someone with avoidant personality disorder tries to escape and avoid responsibility and conflict. Someone with dependent personality disorder "tend[s] to be excessively passive and *269 place responsibility for all decisions and actions on somebody else, usually their spouse." Dr. Nolen stated that the prognosis for both Parents' personality disorders was poor. He suggested additional follow-up and testing but the Division never authorized it. He never followed up with Parents, but the Division asked them to seek individual counseling and attend parenting and anger management classes. Parents completed both classes and attended some individual counseling sessions.
Parents had visitation with their children three to four times weekly. At first, Grandparents supervised the visits but, gradually, Parents were allowed unsupervised visits outside of their home. Eventually, they were able to have overnights at their home with Reeter's approval. Parents would visit with the children during the week and on weekends if they were not participating in Civil War reenactments, which was their hobby.
Before the Division became involved with the family, Father was receiving unemployment benefits. In March 2005, he returned to his seasonal job at a country club. He was terminated shortly after he began but quickly found a job selling vacuum cleaners. He kept that job until October 2005, when his boss received customer complaints about his cleanliness and demeanor. He was unemployed for two months before he found a job working on a farm in the hog barns in December 2005. Father was employed at the farm until March 2006. During the summer and fall of 2006, Father worked at a traveling root beer stand and later at a dairy milking cows. As of the termination hearing, Father was working odd jobs for friends and neighbors and had submitted several job applications.
Mother was never officially employed during the pendency of this case, although she was encouraged to find a job when she was denied SSI. She occasionally cleaned for friends and sold lemonade and root beer at the Civil War reenactments to make money. Throughout the case, Mother had various health problems and visited the emergency room frequently. In September 2005, she had gall bladder surgery and in the spring of 2006, she was diagnosed with breast cancer.
While this case was pending, Parents were sometimes able to clean and maintain the home, but never on a consistent basis. In January 2006, Reeter noticed deterioration in the home's condition, but after speaking with Parents about the possibility of terminating their rights, improvements were made by February 2006. Reeter testified that "in February they had been working really hard on getting the house cleaned." Mother also submitted a budget to Reeter around this time, though it lacked detail. The home's condition began deteriorating again sometime in March or April 2006, when Mother was diagnosed with breast cancer and Father lost his job. In April 2006, Mother had surgery to remove a tumor. That month, Parents decided to move to Amity, Missouri, so that Mother would be closer to her cancer treatment in St. Joseph. They moved in with a friend, Ken Draper, and eventually sold their home in Grundy County.
Reeter was assigned to the case through June 2006, although the last time she saw Parents or children was in April 2006, before Parents moved to Amity, which is in another county. Parents never had another service worker once they moved; no one from the Division ever saw their new home.[2] At trial, Reeter produced only one *270 service agreement, which was dated January 2006, ten months into the case.
When Parents moved to Amity they were unable to visit their children as frequently as they had been, due to the sixty-mile distance, Father's traveling employment, and Mother's chemotherapy treatments. Mother's chemotherapy continued from April through October of 2006. Parents had a joint birthday party for the children in June 2006 and saw them again in October 2006. During this four-month period, they spoke on the phone with their children at least a couple of times per week. Parents also spent most of Thanksgiving with their children in 2006. Parents asked Grandparents on numerous occasions whether the children needed anything. Knowing their finances were tight, Grandparents always said they had everything they needed. Despite this, Parents provided clothing for the children, bought them gifts and a cake for their birthdays, toys and candy for Halloween, and Christmas gifts.
The Division filed a petition to terminate parental rights in May 2006. The trial court held a hearing in November 2006, at which Reeter, Dr. Nolen, the parent aide, and the children's maternal grandmother testified for the Division. Testifying for Parents were both Parents and the children's paternal grandfather. In December 2006, the circuit court found all statutory grounds asserted in the petition against Parents were supported by clear, cogent, and convincing evidence and terminated their parental rights. This appeal follows.
Parents' first point on appeal claims that the trial court erred in finding clear, cogent, and convincing evidence to support termination of their rights under each ground, including mental condition, failure to support, and failure to rectify. Their second point asserts that the trial court erred in finding termination of their rights to be in the children's best interest. We believe that the trial court erred in finding clear, cogent, and convincing evidence that grounds existed to terminate Parents' rights. Therefore, it is unnecessary to address the second point on appeal.

Standard of Review
The appeal of a judgment terminating parental rights is governed by the standard of review set forth in Murphy v. Carron, 536 S.W.2d 30 (Mo. banc 1976). In re Baby Girl P., 188 S.W.3d 6, 10 (Mo.App. W.D.2006). We, therefore, defer to the trial court's ability to determine the credibility of witnesses and will reverse only where the trial court has erroneously declared or applied the law, or where the trial court judgment is not supported by substantial evidence or is against the weight of the evidence. Id. When considering the sufficiency of evidence supporting a trial court's judgment, we view the facts and all reasonable inferences therefrom in the light most favorable to the judgment. In the Interest of C.M.D., 18 S.W.3d 556, 560 (Mo.App. W.D.2000). We will reverse a trial court's judgment terminating parental rights "only when we firmly believe that the judgment is wrong." Id.
"A trial court may terminate parental rights where it finds that it is in the best interest of the child and where it appears by clear, cogent, and convincing evidence that one of the grounds for termination under section 211.447 exists." Id. "`Clear, cogent and convincing evidence in an action for termination of parental rights is evidence that instantly tilts the scales in *271 favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true.'" Id. (quoting In the Interest of J.M., 815 S.W.2d 97, 101 (Mo. App. W.D.1991)).
"Because parental rights are a fundamental liberty interest, statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." In the Interest of A.S.W., 137 S.W.3d 448, 453 (Mo. banc 2004).

Point I: Clear, Cogent, and Convincing Evidence to Support Termination is Lacking
Parents' first point on appeal claims that the trial court erred in finding that grounds existed to support terminating their parental rights. The trial court terminated Parents' rights under subdivisions (2)(a), (2)(d), and (3) of section 211.447.4. The judgment must be affirmed if the termination is supported under any of the three subdivisions and termination was in the best interests of the children. In the Interest of K.A.W., 133 S.W.3d 1, 16 (Mo. banc 2004).

Mental Condition
Section 211.447.4(2)(a) allows for termination of parental rights when a child has been abused or neglected and the parent has "a mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control." There must also be "[i]nformation available to the juvenile officer or the division establish[ing] that the child has been in foster care for at least fifteen of the most recent twenty-two months." Section 211.447.2(1).
The trial court found that Dr. Nolen diagnosed Father with antisocial personality disorder, for which the prognosis was poor. The court also found that Dr. Nolen diagnosed Mother with depression, avoidant personality disorder, and dependent personality disorder, and that her prognosis for the latter two disorders was poor.
Termination of parental rights under section 211.447.4(2)(a), "requires a showing of more than merely the presence of mental or emotional instability or problems; the incapacity must be so severe that it renders the parent incapable of providing minimally acceptable care and the condition cannot be reversed or improved in a reasonable time." In the Interest of S.M.H., 160 S.W.3d 355, 371 (Mo. banc 2005). Under sections 211.447.4(2)(a) and 211.447.4(3)(c), both of which allow termination of parental rights for mental condition, the court must analyze three aspects: "(1) documentation  whether the condition is supported by competent evidence; (2) duration  whether the condition is permanent or such that there is no reasonable likelihood that it can be reversed; and (3) severity of effect  whether the condition is so severe as to render the parent unable to knowingly provide the child necessary care, custody and control." In the Interest of K.A.W., 133 S.W.3d at 13.
Dr. Nolen evaluated Parents only once, in May 2005. He prepared his report at that time, nineteen months before the termination hearing. "Courts have required that abuse or neglect sufficient to support termination under section 211.447.4(2) be based on conduct at the time of termination, not just at the time jurisdiction was initially taken." Id. at 10.
*272 Dr. Nolen testified that he recommended Parents participate in individual counseling sessions and that Mother be evaluated for psychotropic medications. He also stated that avoidant personality disorder is something that can be addressed in psychotherapy. He further testified that it would be important to follow up after giving a diagnosis and making recommendations, but in this case he never did. When asked why he failed to follow up, he replied that "[i]t got discussed but never actuated." Additionally, Dr. Nolen did not do a full-scale parenting evaluation, although he frequently did in other cases. He also stated that he had no indication from his evaluations that either parent had ever emotionally abused the children.
To support the requirement that a mental condition be permanent or have no reasonable likelihood of reversal, the Division submits only Dr. Nolen's testimony that Parents' disorders have poor prognoses. However, he also testified that he recommended counseling and follow-up, evidencing that these may not be permanent disorders affecting their ability to parent. Because Dr. Nolen's testimony was based on information he learned nineteen months before the termination hearing, no clear, cogent, and convincing evidence was presented to support termination of parental rights on the basis of Parents' mental condition.

Failure to Support
Section 211.447.4(2)(d) allows for termination of parental rights when a child has been abused or neglected and there has been "[r]epeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development." To terminate parental rights under this section, the child must have "been in foster care for at least fifteen of the most recent twenty-two months." Section 211.447.2(1).
The trial court found, pursuant to section 211.447.2(d), that Parents "failed to improve their finances or home conditions between February 2005 and April 2006, which was before [Mother] was even aware that she had cancer" and that Parents "could not consistently support themselves, much less their children." The court continued by finding that "[o]ther than some gifts on special events such as the children's birthdays, [Parents] have not provided any meaningful support" and "have continuously failed to provide clothing and support for the children during the period that the children have been in care." The court made no findings regarding Parents' financial or physical ability to provide support for their children.
"Contribution, no matter how minimal, demonstrates a parent's intent to continue the parent-child relationship." In the Interest of J.M.L., 917 S.W.2d 193, 196 (Mo.App. W.D.1996). The issue under 211.447.2(2)(d) "is whether the parent has fulfilled his affirmative duty to support, communicate with, and visit the child." S.M.H., 160 S.W.3d at 367. A parent is not required to pay for all of a child's financial needs, but only as much as he or she reasonably can. Id.
The evidence established that Parents asked Grandparents numerous times what the children needed. Although Grandparents told them they did not need financial assistance, Parents provided clothing and gifts for the children. Additionally, Parents maintained regular contact with their children by telephone and visitation.
In determining that grounds existed to terminate parental rights under this subsection, *273 the court stated several times that its findings were based on the period of time from February 2005 until June 2006, even though "[c]ourts have required that abuse or neglect sufficient to support termination under section 211.447.4(2) be based on conduct at the time of termination, not just at the time jurisdiction was initially taken." K.A.W., 133 S.W.3d at 10. The trial court failed to take into consideration Parents' support and housing conditions for the seven months leading up to the termination hearing. The record does not support a claim of failure to provide financial support sufficient to terminate parental rights.

Failure to Rectify
Section 211.447.4(3) allows for termination of parental rights when:
[t]he child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.
When a petition to terminate parental rights is filed under this section, the court must consider and make findings on the following factors:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]
Section 211.447.4(3). In finding that the conditions leading to the court's assumption of jurisdiction persisted, the court found that:
The conditions which lead [sic] to the assumption of jurisdiction were [Parents'] inability to maintain their own home in an appropriate fashion, prioritize and budget their finances, and keep their own home safe for children. The Court finds these conditions still persist in as much as the parents do not even own their own home at this time, and cannot provide a safe and sanitary home of their own, and the relationship with Mr. Draper is subject to change at any time.
The court believed that "the self-reported improvement by [Parents] is more related to Mr. Draper's presence in a home that he owns, than anything else."
The trial court found that subsection (d) did not apply, but made findings on subsections (a) through (c). Pursuant to section 211.447.4(3)(a), the court found that Parents failed to comply with a social service plan in the following respects: Parents "failed to maintain appropriate housing, *274 with working utilities; [Parents] failed to provide a family budget that would allow for them to provide basic needs of the children, such as utilities and shelter; and the parents failed to keep their home in a clean and safe manner for any significant period of time." The court made no specific findings under subsections (3)(b) or (3)(d), but merely recited the statutory language. The issue of mental condition is discussed above.
Among its findings, the trial court cited the Parents' failure to comply with the social service plan. But, a parent need not completely satisfy all aspects of a plan in order to avoid termination. S.M.H., 160 S.W.3d at 368. A parent's failure to comply with one or more parts of a social service plan does not, by itself, constitute a ground for terminating a parent's rights; rather, it is merely a factor to consider under section 211.447.4(3). Id. at 368-69. "The issue is whether progress has been made in complying with the service agreements, not whether there has been full or substantial compliance." Id. at 369.
The court found that Parents did not maintain appropriate housing with working utilities and were unable to keep the house in a clean and safe manner for a significant period of time. The court failed to consider that Parents had sold the home from which the children were taken and had been living in a clean, neatly kept home that they rented. Father testified that they paid rent timely and always had working utilities. The last service plan that Parents entered into with the Division was in January 2006. The last time anyone from the Division saw Parents or their residence was in April 2006, seven months before the termination hearing. Additionally, the record reflects that while Parents had not fully complied with the service plan through April 2006, they had made significant strides. Parents had complied with attending parenting and anger management classes and individual counseling. Mother had submitted a budget to the Division and was sometimes able to keep the home clean.
The trial court's finding that Parents were unable to "maintain their own home" because they "do not even own their own home at this time" is irrelevant as to whether or not conditions that led to removal still exist. There is no requirement, by statute or case law, requiring a parent to own, rather than rent, a home to avoid termination of his or her rights. Additionally, there was no evidentiary basis for the trial court's assertion that Parents' rental arrangement is "subject to change at any time." In fact, Father testified that the lease was no different from any other rental agreement. Father testified that he and Mother paid $300 monthly for the space, had exclusive rights to the portion of the home they occupied, and could rent additional bedrooms if necessary. However, Father testified that his long-term goal was "to either buy or rent another home somewhere that would be just us and the children."
Past behavior supports grounds for termination only if it is "convincingly linked to predicted future behavior." K.A.W., 133 S.W.3d at 9-10. "Most courts will agree that neglect must exist at the time of the termination hearing, and that it is inappropriate to terminate a parent's rights on the basis of neglect that happened in the remote past and no longer exists." Id. at 10 n. 6 (quoting 32 Am Jur Proof of Facts 3d Parental Rights sec. 6 (2003)). As with findings under section 211.447.4(2), "courts have required that a failure to rectify sufficient to support termination under section 211.447.4(3) be based on a determination that conditions of a potentially harmful nature continued to *275 exist as of the termination, rather than a mere finding that conditions that led to the assumption of jurisdiction still persisted." Id.
The court below not only failed to consider that Parent's poor home conditions no longer existed but failed to credit Parents for having maintained a clean home with working utilities for the seven months leading up to the termination hearing. The trial court's finding that grounds existed to terminate parental rights under section 211.447.4(3) is not supported by clear, cogent, and convincing evidence.
Most of the trial court's findings were based on information gathered seven months prior to the termination hearing, while information regarding Parents' mental health was gathered nineteen months prior to the hearing. Again, it seemed the attitude of the Division that once Parents moved to another county its obligation or even ability to follow-up or provide services ended. Point granted.

Point II: Best Interest Analysis
Parents' second point claims that the trial court erred in finding that termination of their rights was in the children's best interests. Section 211.447.5 allows for termination of parental rights when the court finds it is in the best interest of the child and when it appears by clear, cogent, and convincing evidence that grounds exist for termination pursuant to subsection 2, 3, or 4 of section 211.447. We reach the issue of the best interests of the child only after determining that one or more of the statutory grounds for termination of parental rights exist. T.A.S. v. P.S.L., 32 S.W.3d 804, 815 (Mo.App. W.D.2000). Because we reverse on Point I, we need not reach the issue of whether the termination was in the children's best interests.

Conclusion
The trial court's findings were not supported by clear, cogent, and convincing evidence that grounds existed to terminate parental rights. The judgment is reversed and remanded.
HAROLD L. LOWENSTEIN, Judge, and THOMAS H. NEWTON, Judge, concur.
NOTES
[1] All statutory references are to Missouri Revised Statutes, 2000, unless otherwise indicated. Section 211.447 was amended and recodified in 2007. Because the trial court decided the case before the amendments were made, this opinion will refer to the former codification.
[2] The transcript leaves the impression that the Division of Children's Services views the 45 Missouri counties as sovereign nations with passports necessary for a worker to visit a client even in the next county. The Division criticized the Parents for failure to go to the Division County Office at their new home to request a new caseworker.