**Opinion issued October 3, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00301-CV

———————————

## IN THE INTEREST OF G.A.M., A CHILD

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-00472J**

---

## MEMORANDUM OPINION

In this appeal, O.T.F.C. (Mother) challenges the trial court's final decree terminating her parental rights to her minor child, G.A.M. (Gina), based on findings that Mother failed to comply with provisions of a court-ordered family service plan pursuant to Family Code section 161.001(b)(1)(O) and that Mother has a mental or emotional illness or mental deficiency that renders her unable to

provide for Gina's needs pursuant to Family Code section 161.003. In her sole issue on appeal, Mother contends that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in Gina's best interest.

We affirm.

## Background

Mother gave birth to Gina on December 24, 2021. Gina came into the care of the Department of Family and Protective Services (DFPS) in March 2022, before she was three months old, because of concerns regarding Mother's ability to care for her. At the time she was removed, Gina was severely underweight and unkempt. The affidavit of the DFPS caseworker related concerns regarding the health and safety of Gina's living environment with Mother. When DFPS investigated the initial report, Mother was living with a man who was not Gina's father. DFPS encouraged Gina's maternal grandmother (Grandmother) to intervene, and Grandmother indicated that she would check in regularly with Mother and Gina. DFPS observed that Mother was not able to follow feeding instructions or provide a safe environment for Gina, so Mother agreed to have Gina placed with Grandmother. However, a family friend subsequently raised concerns that Grandmother routinely left Gina with inadequate caregivers while she went "out and about in the streets."

2

On March 22, 2022, DFPS obtained temporary conservatorship over Gina and placed her in a foster family. The trial court ordered a family service plan with numerous requirements for Mother, such as completing a psychological evaluation, a psychiatric evaluation, parenting classes, and individual counseling. The family service plan also ordered that Mother maintain stable housing and employment. Mother did not complete the family service plan, and DFPS sought to have her parental-rights to Gina terminated.

At trial, DFPS presented the testimony of a psychologist, A. Ross, who had completed Mother's psychological evaluation. Ross testified that she evaluated Mother several months before trial, and her expert report was offered into evidence. Ross testified that one of the assessments she performed measured Mother's cognitive ability, which was extremely low. Specifically, Ross testified that Mother's comprehension levels were at the level of a kindergartener. Ross believed that Mother could work at a job with assistance, but her low cognitive abilities would impact her ability to do things such as determine the correct dose for medication or mix powdered formula correctly. She further testified that Mother could not realistically improve her cognitive abilities at this point in her life. While Mother might be able to learn new vocabulary or acquire new skills with opportunity for repeated practice, Mother would continue to struggle to adapt to new situations, ideas, or experiences.

With regard to Mother's ability to parent, Ross was concerned that Mother would not understand the developmental needs of a child, nor would she be able to respond appropriately to new situations that would arise with her child. Ross believed it was possible that Mother could learn to meet Gina's basic needs, and Ross testified that low-functioning parents could nevertheless be capable of parenting with help and practice.

Ross further testified that Mother seemed open to having someone help her parent Gina. However, Ross was not aware of Mother's living situation, which had included a history of living with multiple other people. Ross was also concerned about Grandmother's decision to leave Mother with an abusive man and about the fact that Mother had several sexual partners while under Grandmother's care.

DFPS caseworker H. Tate testified that Gina was removed from Grandmother's care after Grandmother left Gina with a friend who had no idea where the Grandmother had gone. DFPS also removed Gina from Mother's care because of concerns over how Mother was feeding Gina due to the child being severely underweight. Tate testified that Mother was not mixing the bottles correctly. Tate and DFPS colleagues observed other troubling circumstances that called into question Mother's ability to feed Gina and keep her safe. Tate testified about one occasion when Mother left Gina unattended on a changing table and had to be redirected multiple times before she returned to Gina. Mother could not

4

diaper Gina without significant help. Tate further testified that Grandmother had been present when Mother left Gina on the changing table but did not intervene. On another occasion, a service provider observed Mother offer Gina a piece of cheese that could have posed a choking hazard.

In addition to being underweight, Gina had a condition affecting her head and neck when she came into DFPS care. Neither Mother nor Grandmother had done anything to address the condition. Gina had since received treatment and did not have any special needs at the time of trial.

Regarding Mother's family service plan, Tate testified that Mother had failed to complete the required psychiatric evaluation and individual counseling. The service providers were aware of the results of Mother's psychological evaluation. Tate also testified that Mother had not maintained stable housing through the pendency of the case—she moved several times and had moved into a new apartment a week before trial. Tate did not believe that Grandmother and Mother had been honest with DFPS about their living situations, saying that they had their own place but were in fact living with other people and moving multiple times. Tate further testified that Mother began working with Grandmother cleaning houses the week before trial, but Tate had not received any documentation regarding this employment. Tate believed that Mother loved Gina, and Tate knew

that Mother wanted Gina to stay with her. Tate had not observed significant improvement in Mother's parenting skills despite the family plan of service.

Tate testified that Mother informed DFPS that her father and his wife would be willing to help with Gina. Tate testified that the grandfather had a history with adult protective services and was listed as the perpetrator in the agency's report. Tate met with the grandfather the day before trial when he showed up at her office, but she did not know why he was not identified earlier in the case as a potential support for Mother and Gina.

Tate testified that Gina's current placement was meeting her needs. The foster family attended her physical therapy and helmet therapy to treat the head and neck condition. They also addressed other medical needs as they appeared, and they had an extended family support system. Gina had gained weight and, despite being developmentally behind when she first came into care, Gina was meeting her developmental milestones. Tate also believed that Gina was bonded with her foster family, and the family wanted to adopt her if she became eligible for adoption. The foster family expressed an intent to allow Gina to have ongoing contact with Mother if they adopted Gina.

The guardian ad litem, A. Stromgren, testified that the Child Advocates organization was recommending termination of parental rights and placement with the foster family. Stromgren acknowledged that Mother wanted Gina returned to

her, but Stromgren had serious concerns regarding Mother's cognitive ability and its impact on her ability to safely parent Gina. Stromgren did not believe that Mother could address Gina's basic feeding and hygiene needs. Stromgren observed Mother struggle to diaper Gina without assistance and leave Gina unattended on the sofa multiple times. Stromgren further testified, "There were multiple times at each visit where the child was left [unattended] usually on the sofa. And Mom nor grandmother was supporting the child to prevent the child from falling; it was usually CPS or the transporter."

Stromgren also testified that Child Advocates was concerned about both Mother's and Grandmother's stability. Child Advocates received numerous, inconsistent explanations of where Mother and Grandmother were living throughout the case. Stromgren testified that the last time she spoke with Grandmother, "she had found someone on Facebook to move in with on February 21, [2023]," approximately three weeks before the trial. However, she believed that Mother and Grandmother had moved into a new residence the day of trial. She also did not believe that Grandmother had shown the ability or interest in protecting Mother, nor did Grandmother show an ability to help Mother parent Gina. Stromgren testified that Child Advocates had multiple conversations with Grandmother about introducing Mother to multiple paramours, but Grandmother was not appropriately protective of Mother.

Stromgren also testified that Gina was, at the time of trial, walking well and would be at additional risk if appropriate safety precautions were not taken. Stromgren had observed Gina in the foster home, and she observed that the placement was safe and meeting Gina's needs. Stromgren testified that the foster parents were very involved in obtaining the care Gina needed to treat the condition with her head and neck. The foster family had also engaged additional therapy services and provided activities like gymnastics to help Gina catch up and start meeting developmental milestones.

Foster Mother testified that Gina had been living in her home for nearly a year. When Gina first came to Foster Mother's home, the girl was not quite three months old and weighed only ten pounds. This meant that Gina was in the third percentile for her weight, which did not match up with her length and head circumference. Gina seemed exhausted and struggled to take a bottle. Foster Mother also testified that Gina was "pretty grimy and dirty": She "had a lot of dirt under her fingernails, which were long and not clipped." Gina also had cradle cap, "and it looked like it hadn't really been combed or shampooed because her hair was kind of glued to her head." Foster Mother also found "debris" like something "from either a stuffed animal or a blanket, something fuzzy," in Gina's stools during the first week Gina was under her care. Gina also had a condition called torticollis that had been untreated, and she had plagiocephaly, or a flat head. Foster

Mother participated in treatment for the conditions by having Gina fitted for a helmet and engaging in physical therapy.

Foster Mother testified that Gina's head has improved and she no longer has on-going medical issues. Her weight was in the eighty-fourth percentile at her last check-up. Gina was verbal and meeting her developmental milestones regularly. The foster family would continue providing enrichment activities for Gina, and Foster Mother testified that Gina liked piano and playing with Foster Mother's nine-year-old daughter. Foster Mother was willing to continue visits between Gina and Mother in a safe way if the court allowed that to occur. Foster Mother testified that she wanted to care for Gina for the rest of her life and hoped Gina would stay with her. She hoped that Gina would be able to maintain a relationship with Mother and Grandmother.

Grandmother testified that, at the time DFPS removed Gina from Mother's care, Grandmother was concerned about the man Mother was living with because he would "scream really ugly things to [Mother]." Grandmother took Gina to live with her because she did not believe Gina was safe with him, and then Mother also came to live with Grandmother. Grandmother believed that Mother needed help to take care of Gina. Grandmother testified that she currently had a place to live where Mother and Gina could join her.

Gina was placed with Grandmother after DFPS first removed her, but Gina was removed from Grandmother's care. Grandmother testified that this was because she left Gina to go to a party, although Grandmother testified that she did not leave Gina alone and she believed Gina was safe while she was out. Grandmother testified that Mother loved Gina and took care of her.

Mother testified that she did not want the foster family to adopt Gina. She wanted her daughter returned to her. When asked whether she fed Gina regularly, Mother testified answered, "Every day, eat. At 8:00." Mother testified "yes" when asked whether she sought medical care for Gina when she was severely underweight:

[DFPS]: And what did the pediatrician instruct you to do?

[Mother]: Milk.

[DFPS]: How often did you feed her?

[Mother]: Three times.

Mother further testified that she lived with Grandmother and had help from Grandmother, her father, and her father's wife. Mother believed that she had completed parenting classes and all of the other services that DFPS required.

The trial court rendered its final decree of termination. It found that Mother failed to complete the court-ordered family service plan pursuant to Family Code subsection 161.001(b)(1)(O); that she had a mental deficiency that rendered her

unable to care for Gina and that would likely continue through Gina's 18th birthday, pursuant to Family Code section 161.003(a); and that termination of the parent-child relationship was in Gina's best interest. The trial court further appointed DFPS as Gina's sole managing conservator. This appeal followed.

## Sufficiency of Best Interest Finding

In her sole appellate issue, Mother contends that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in Gina's best interest. We disagree.

### A. Standard of Review

A trial court may order termination of the parent-child relationship if it finds one of the statutorily enumerated predicate grounds for termination and that termination of parental rights is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *see also* TEX. FAM. CODE § 161.003(a) (providing that court may terminate parent-child relationship if it finds, among other things, that parent has "a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child" and "the termination is in the best interest of the child"). DFPS must prove both elements—a statutorily prescribed predicate finding and that termination is in the child's best interest—by clear and convincing evidence. *See In re E.N.C.*, 384 S.W.3d at 802–03 (stating that federal due process clause and Texas

11

Family Code both mandate "heightened standard of review" of clear and convincing evidence in parental-rights termination cases); *see also* TEX. FAM. CODE § 161.003(a)(2) (requiring clear and convincing evidence to support finding that mental deficiency will continue to render parent unable to provide for child until 18th birthday of child). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re E.N.C.*, 384 S.W.3d at 802.

"Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *Id.* at 630–31. In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

The Texas Legislature has set out several factors that courts should consider in determining whether a child's parent is willing and able to provide the child with a safe environment, including: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude and frequency of harm to the child; (4) whether the child has been the victim of repeated harm after the initial intervention by DFPS; (5) the results of psychiatric, psychological, or developmental evaluations of the child's parents, family members, or other people with access to the home; (6) the willingness of the child's family to seek out, accept, and complete counseling services; (7) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and (8) whether the child's family demonstrates adequate parenting skills, including providing minimally adequate care for the child's health and nutritional needs, care consistent with the child's physical and psychological development, guidance and supervision consistent with the child's safety, a safe physical home environment, and an understanding of the child's needs and capabilities. TEX. FAM. CODE § 263.307(b).

The Supreme Court of Texas has also set out several non-exclusive factors that we should consider when determining whether the termination of a parent's rights is in the child's best interest, including (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) the current and future physical

13

and emotional danger to the child; (4) the parenting abilities of the person seeking custody; (5) the programs available to assist the person seeking custody in promoting the child's best interests; (6) the plans for the child by the person or agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not proper; and (9) any excuse for acts or omissions of the parent. *In re J.W.*, 645 S.W.3d 726, 746 (Tex. 2022) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *In re A.C.*, 394 S.W.3d 633, 641–42 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

These factors are not exhaustive, and it is not necessary that DFPS prove all these factors "as a condition precedent to parental termination." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re M.A.J.*, 612 S.W.3d 398, 410 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). The absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in the children's best interest. *In re A.C.*, 394 S.W.3d at 642.

The best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re Y.G.*, No. 01-22-00181-CV, 2022 WL 3362953, at *13 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022, pet. denied) (mem. op.) (citing *In re B.R.*, 456 S.W.3d 612, 616

(Tex. App.—San Antonio 2015, no pet.)). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *In re B.R.*, 456 S.W.3d at 616; *see In re C.H.*, 89 S.W.3d at 28 (stating that past performance as parent "could certainly have a bearing on [parent's] fitness to provide for" child, and courts should consider prior history of child neglect in best-interest analysis).

## B.    Analysis

Here, sufficient evidence of numerous factors supports the trial court's determination that termination of Mother's parental rights to Gina was in the child's best interest. Regarding Gina's age and physical and mental vulnerabilities, the evidence at trial indicated that Gina was still very young—just a little over a year old at the time of trial—and so she needed an environment where she could be fed safely and regularly. Foster Mother testified that Gina was starting to walk and talk, and Gina's guardian ad litem Stromgren testified that she needed a safer environment than Mother could provide.

Regarding the frequency and nature of Gina's out-of-home placements, DFPS presented evidence that it first attempted to place Gina in Grandmother's care when Gina was three months old. However, Grandmother was unable to provide adequate care because she would leave Gina with inappropriate people or would leave without telling the caregiver how to get in touch with her. Gina was

15

placed with her current foster family just before she was three months old, and they were hoping to adopt her.

The evidence also demonstrated that Mother had been unable to care for Gina. Gina was severely underweight when she was removed by DFPS because Mother did not understand how to feed her. Gina's basic hygiene needs were not being met, and she had untreated medical conditions. Mother was unable to understand these concerns, nor was she able to address them. Ross testified regarding Mother's psychological evaluation, which demonstrated that Mother's cognitive ability was very low and was not likely to improve. Mother could learn new tasks, but she could not react appropriately to new situations. Stromgren and Tate both testified that they observed Mother throughout the pendency of the case, and she struggled to keep Gina safe. She could not mix bottles correctly or change diapers. Despite parenting classes and other efforts, Tate did not see an improvement in Mother's parenting abilities. *See* TEX. FAM. CODE § 263.307(b) (best-interest factors include parent's willingness to seek out services and demonstrate ability to provide adequate parenting skills).

Furthermore, Mother was not able to complete her family service plan, and evidence at trial indicated that her living and working situations remained unstable during the pendency of the case. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (holding that parent's inability to provide stable

16

home and failure to comply with family plan of service supported finding that termination was in child's best interest). Mother needed significant help to meet her own needs.

While it was clear that Mother loved Gina and wanted to care for her, there was no evidence introduced at trial that Mother herself was capable of providing the care that a growing child like Gina would need. The foster family, on the other hand, was able to meet Gina's medical and developmental needs. They wanted to adopt Gina and were willing to see that she maintained a relationship with Mother and Grandmother to the extent they could do so safely. *See* TEX. FAM. CODE § 263.307(b); *Holley*, 544 S.W.2d at 372 (holding that future plans for child are relevant to best-interest determination). The evidence also showed that Gina had bonded with her foster family and was well-cared for. *See In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.) (considering that child was bonded to foster family when child was too young to express desires). Foster Mother testified that she wanted to adopt Gina and that Gina enjoyed playing with her foster sister. When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Viewing the evidence in the light most favorable to the fact-finding, we conclude that the trial court could form a firm belief or conviction that termination of Mother's parental rights was in Gina's best interest. *See In re A.C.*, 560 S.W.3d at 631.

Mother argues that termination of her parental rights "because of her cognitive limitations is unnecessary and unwarranted under" the facts of the case, where it was demonstrated that Mother loved Gina and where "opinions as to what Mother can or cannot do at present are debatable." Mother also argued that "opinions as to what she can or cannot do in the future remain speculative."

It was not disputed that Mother loves Gina, but we observe that the best-interest inquiry is "child-centered and focuses on the child's well-being, safety, and development." *Id.* The evidence demonstrated more than the mere fact that Mother had severe cognitive limitations. DFPS presented evidence that Mother's limitations resulted in problems with feeding Gina that resulted in her being very underweight by the time she was three months old. Mother's testimony regarding her feeding of Gina demonstrated that Mother was unable to understand or follow the feeding advice of the pediatrician. Both Tate and Stromgren testified that Mother continued to struggle with basic tasks like diapering Gina or supervising her properly. Tate observed Mother attempt to feed Gina a piece of cheese that would have posed a choking hazard to an infant like Gina. *See In re J.P.-L.*, 592

18

S.W.3d 559, 582–83 (Tex. App.—Fort Worth 2019, pet. denied) (holding that parent's mental capacity is probative of best interest because mental issues are relevant to ability to care for child's physical and emotional needs); *see also In re B.J.C.*, 495 S.W.3d 29, 36 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (holding that evidence of mental deficiency, by itself, is not ground to termination parent-child relationship, but evidence that parent's mental deficiency prevents her from providing for child now and in future supports termination).

Even if we agreed that the evidence of Mother's ability was "debatable," we observe that the trial court, as the fact-finder, was entitled to resolve any inconsistencies or discrepancies in the evidence. *See In re A.C.*, 560 S.W.3d at 630–31 (holding that court's assume that any disputed facts were resolved in favor of finding if reasonable factfinder could have done so). We also observe that the evidence regarding Mother's ability to care for Gina in the future was not "speculative." Ross testified that, while Mother could learn some tasks through repetition, she would not understand the developmental needs of a child, nor would she be able to respond appropriately to new situations that would arise with her child. Ross did not believe that Mother would be able to improve her cognitive ability, and her mental condition meant that she would struggle with things like determining the correct dose of medication or how to mix formula to feed Gina. Tate testified that she did not see any improvement in Mother's parenting ability

19

over the course of the case, despite efforts by DFPS and parenting classes. *Cf. Salas v. Tex. Dep't of Protective & Regulatory Servs.*, 71 S.W.3d 783, 790 (Tex. App.—El Paso 2022, no pet.) ("Section 161.003 does not require scientific certainty that [a parent's] mental illness [or deficiency] will continue until the children are eighteen; it only requires reasonable probability.").

Mother further argues that she can raise her daughter with assistance, citing the fact that she lives with Grandmother. However, the evidence at trial indicated that Grandmother was not sufficiently protective of either Mother or Gina. DFPS originally placed Gina with Grandmother after she was removed from Mother's care, but Gina was unable to stay with Grandmother because Grandmother did not provide adequate supervision. Tate and Stromgren both testified that they had concerns regarding Grandmother's ability to provide a safe, stable environment. Grandmother moved several times through the pendency of the case. Stromgren testified that on at least one occasion, Mother left Gina on the sofa and Grandmother did not intervene to keep Gina safe.

Stromgren further testified that Child Advocates were concerned about the fact that Grandmother introduced numerous sexual partners to Mother, and Grandmother left Mother and Gina living with a man who was potentially unsafe. Mother further argues that her father and his wife could have provided support to her and Gina. However, Mother's father was not available to DFPS during the year

this case was pending. Tate testified that he showed up at her office the day before trial, so DFPS could not establish whether he was an appropriate care giver. Tate testified that he had been named as the perpetrator in a report made to adult protective services. There is no evidence that he provided any protection or support to either Mother or Gina. Thus, the trial court could have concluded that Mother would not have sufficient support from Grandmother or any other family member.

Thus, considering the entire record, including disputed evidence, we conclude that the disputed evidence is not so significant that the trial court could not have formed a firm belief or conviction that termination of Mother's parental rights was in Gina's best interest. *See In re A.C.*, 560 S.W.3d at 631.

We overrule Mother's sole issue.

### Conclusion

We affirm the final decree of the trial court.


                                          Richard Hightower
                                          Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.